Filed 3/19/13  P. v. Jones CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E055775 |
| v. | (Super.Ct.No. RIF10002592) |
| OLIVER JONES, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Joe O. Littlejohn, Judge. (Retired judge of the San Diego Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

John L. Staley, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Bradley Weinreb, and Kathryn Kirschbaum, Deputy Attorneys General, for Plaintiff and Respondent.

# I

## INTRODUCTION[1]

A jury convicted defendant Oliver Jones of four sexual offenses against a minor—oral copulation, two counts of sexual intercourse, and a lewd act—committed in 2008 and 2010.[2] The court sentenced defendant to three years in prison.

On appeal, defendant argues the trial court erred by admitting hearsay evidence and by the instructions it gave on the fresh-complaint doctrine. Defendant also seeks to vacate the requirement that he register as a sex offender and he asks to be awarded additional conduct credits of 58 days. We reject defendant's contentions and affirm the judgment.

# II

## FACTUAL BACKGROUND

Jane Doe was born in September 1993. She was enrolled in a college nursing program and 18 years old when she testified at trial in January 2012. Between the ages of 11 and 17, she lived with her mother, her stepfather, and her sisters in a two-story house in Moreno Valley. The bedrooms were upstairs with a guest room downstairs. Defendant was her mother's best friend and was godfather to Jane Doe's older sister. He called often on the telephone from Texas where he was living. Jane Doe regarded

---

[1] All statutory references are to the Penal Code unless stated otherwise.

[2] Sections 261.5, subdivisions (c) and (d), (counts 2 and 4); 288, subdivision (c), (count 3); and 288a, subdivision (b)(2), (count 1).

defendant like a father and felt she could talk about anything with him. Jane Doe was a virgin before August 2008.

*A. August 2008*

In August 2008, when Jane Doe was 14 years old, defendant visited and spent the night. Defendant slept downstairs on a blow-up mattress. Defendant left the next day and returned later at night after Jane Doe had fallen asleep downstairs.

Jane Doe awoke when defendant began groping her breasts, stomach, and genitals. Defendant pulled down her underwear and told her to "shush." Jane Doe was shocked and began crying as defendant began having sex with her. When defendant inserted his penis in her vagina, she felt a ripping sensation, pain, and discomfort. She tried to squirm away but defendant was stronger. Defendant grunted and said, "This was good stuff." When she said, "no," defendant responded, "They won't understand. This is our little secret." The assault went on for a long time, about 30 minutes. After the intercourse, defendant requested her to perform oral sex on him which she did unwillingly for a few minutes. He did not ejaculate and she stopped and got dressed. Afterwards defendant asked her to walk around to determine whether she "walked differently."

Jane Doe went upstairs to her bedroom and was afraid to tell her mother because her mother might blame her. Defendant did not threaten her but she was afraid of him. In the morning, there was blood on her underwear which she threw in the trash. At breakfast with defendant and her mother and sisters, Jane Doe said nothing about what had happened. Defendant approached her and said she could not tell anyone because "it's our little secret. They wouldn't understand us."

3

Later defendant would talk to Jane Doe on the telephone about how nice it had been and that he wanted to repeat the conduct and go on a date. Jane Doe began feeling again like defendant was a friend and father figure to whom she could talk freely.

In October 2008 or 2009, Jane Doe confided to her best friend, Mariah, while they were attending a football game. She also told her cousin. Jane Doe was not getting along with her mother. There was an incident in which they argued and her mother threw a hanger at her. At one point, her mother suggested Jane Doe stay with defendant in Texas and defendant wanted her to come.

When Jane Doe first reported the incident to a police officer, she did not mention performing oral sex because she was embarrassed. She also made contradictory statements about whether defendant wore a condom.

B. *March 2010*

In March 2010, Jane Doe had been treated at a hospital for anemia. When she returned home on March 11, 2010, defendant was visiting. Jane Doe shared a bedroom with her sisters. Defendant was staying in another upstairs bedroom. Defendant arrived that night. The family members went to bed about 1:00 a.m. Jane Doe stayed up doing homework and listening to music on her headphones when defendant called her using the house telephone. Defendant invited her to his room to talk and she delayed for a while but eventually joined him. She was wearing undergarments and pajamas and sat on the floor. They talked until defendant turned off the light, closed the door, and sat down beside her. Defendant began caressing her face and shoulders and kissing her. Then he pushed her on the floor and got on top of her. He removed their clothes and inserted his

4

penis into her vagina.  He moved her on to her knees and then on top of him and told her it felt good.  At the conclusion, he told her again it was a secret and nobody would understand.  She dressed and left.  Jane Doe felt stupid, mad, sad, dirty, and like an idiot.

## C.  Jane Doe's Letter to Her Mother

In April 2010, Jane Doe told her mother because she had been having nightmares and was afraid for her little sister.  She wrote her mother a letter and slipped it under the door.  In the letter, she explained she had sex with defendant in August 2008.  She had fallen asleep downstairs and, when she awoke, he was rubbing and kissing her.  Jane Doe was too scared to tell her mother but she was miserable and sorry.  She became involved with three other guys.  She had sex again with defendant and she felt "worthless like the world's biggest ho."

## D.  The Pretext Calls

The police arranged for Jane Doe to make recorded pretext calls to defendant.  In one call, she told defendant she had an STD and could not be treated because she was only 16 years old.  When she asked defendant if he had used a condom, he hung up the telephone.  When he called back, defendant talked about finding a solution but he was worried about whether the call was being monitored.  He also claimed to be healthy but he did not deny having sex with her.  Defendant called Jane Doe again to discuss the possibility that her symptoms were a yeast infection or a urinary tract infection.  Again he did not deny having sex with her.  Defendant talked about borrowing money to come visit.  Jane Doe asked him if he had sex with her older sister too and he became defensive

5

and said it was impossible. When defendant insisted he cared about Jane Doe, she accused him of forcing her to lose her virginity. He never apologized to her.

*E. Mariah's Testimony*

Mariah testified that Jane Doe confided to her at a football game that she had been raped at home.[3] Later, Jane Doe told her the story in detail, including that defendant, the offender, was like her uncle. One night, she was sleeping and he began kissing her and removing her underwear and he raped her. Jane often mentioned that defendant kept calling her after the rape.

*F. Defendant's Testimony*

Defendant testified that he and Jane Doe's mother had been friends since high school and he was godfather to Jane Doe's older sister. Defendant and Jane Doe's mother had a sexual relationship as recently as 2001. Defendant talked a lot with Jane Doe on the telephone and gave her fatherly advice. Defendant denied having sexual relations with Jane Doe.

While on a business trip in August 2008, defendant visited and slept downstairs. He left early the next morning. He came back on a second night and talked to Jane Doe before he went to sleep. The family had breakfast before he left. He came back for a third night but left about 2:00 a.m.

When defendant visited in March 2010, he slept upstairs. Defendant testified that someone came in and lay down with him in the middle of the night and he thought it was

---

[3] Mariah told an investigator Jane Doe had first confided to her in 2009 but she testified it was 2008.

6

Jane Doe's mother. They slept together until he left at 4:00 or 5:00 a.m. He woke Jane Doe and asked her to lock the door when he left.

Jane Doe called him at work where he could not talk privately or hear her very well. He suspected there was "some evil malice" behind the calls. He wanted to help if she had an STD. On cross-examination, he vehemently denied Jane Doe's allegations against him.

Several friends of defendant testified about his good character.

III

HEARSAY EVIDENCE

Defendant challenges the rulings of the trial court allowing admission of Mariah's testimony about what Jane Doe confided to her after the first incident and Jane Doe's testimony about the letter she wrote to her mother after the second incident. We review the trial court's evidentiary ruling for an abuse of discretion. (*People v. Thomson* (2010) 49 Cal.4th 79, 128.) We conclude there was no error but, even if there was error, it was harmless in view of the other evidence.

We agree with the prosecution that both kinds of evidence were admissible under the fresh-complaint doctrine as discussed in *People v. Brown* (1994) 8 Cal.4th 746, 749-750, permitting details about the identity of the perpetrator and the nature of the offense: "... *under principles generally applicable to the determination of evidentiary relevance and admissibility*, proof of an extrajudicial complaint, made by the victim of a sexual offense, disclosing the alleged assault, may be admissible for a limited, nonhearsay purpose—namely, to establish the fact of, and the circumstances surrounding, the

7

victim's disclosure of the assault to others—whenever the fact that the disclosure was made and the circumstances under which it was made are relevant to the trier of fact's determination as to whether the offense occurred. Under such generally applicable evidentiary rules, the timing of a complaint (e.g., whether it was made promptly after the incident or, rather, at a later date) and the circumstances under which it was made (e.g., whether it was volunteered spontaneously or, instead, was made only in response to the inquiry of another person) are not necessarily determinative of the admissibility of evidence of the complaint. Thus, the 'freshness' of a complaint, and the 'volunteered' nature of the complaint, should not be viewed as essential prerequisites to the admissibility of such evidence."

Mariah's testimony and the letter were both admissible because Jane Doe volunteered the information about defendant's identity and the evidence helped establish the fact of, and the circumstances surrounding, her disclosure of the assault to others. Admission of the letter was also admissible as state-of-mind evidence to show why Jane Doe had not disclosed the rapes to her mother at an earlier time:

"Admission of evidence of the circumstances surrounding a delayed complaint, including those that might shed light upon the reason for the delay, will reduce the risk that the jury, perhaps influenced by outmoded myths regarding the 'usual' or 'natural' response of victims of sexual offenses, will arrive at an erroneous conclusion with regard to whether the offense occurred. [Citation.] Particularly in a case such as the present one, in which the victim testifies to a series of alleged sexual offenses over a considerable period of time, during which the victim had the opportunity to disclose the alleged

8

offenses to others but failed to do so, the exclusion of all evidence relating to the context in which the victim ultimately disclosed the alleged offenses to others is likely to leave the jury with an incomplete or erroneous understanding of the victim's behavior.  So long as the evidence that is admitted is carefully limited to the fact that a complaint was made, and to the circumstances surrounding the making of the complaint, thereby eliminating or at least minimizing the risk that the jury will rely upon the evidence for an impermissible hearsay purpose, admission of such relevant evidence should assist in enlightening the jury without improperly prejudicing the defendant." (*People v. Brown, supra,* 8 Cal.4th pp. at 761-762; Evid. Code, § 1250, subd. (a).)

Jane Doe's letter served to explain why Jane Doe did not disclose immediately to her mother because she was afraid of her mother's response and disappointment and because she was having nightmares.  Even if some of the details in the subject evidence should not have been admitted it was still harmless.  (*People v. Fair* (1988) 203 Cal.App.3d 1303, 1313.)  Mariah testified that Jane Doe told her about some of the details of the rape itself and about defendant's conduct after the rape.  In the letter, Jane Doe also described the details of both rapes.  Nevertheless, this evidence was all cumulative to Jane Doe's direct trial testimony about the offenses.  (*People v. Blacksher* (2011) 52 Cal.4th 769, 818, fn. 29; *People v. Manning* (2008) 165 Cal.App.4th 870, 881; *People v. Ramirez* (2006) 143 Cal.App.4th 1512, 1526.)

In addition to Jane Doe's testimony, there was also the damning evidence of the pretext telephone calls during which defendant never denied ever having sex with Jane Doe but was very concerned about whether and how she had contracted an STD and how

9

she could obtain treatment. Additionally, defendant was extremely worried the telephone calls might be monitored by his employer.

Finally, Jane Doe's statements to Mariah in October 2008 (or 2009) were admissible in rebuttal as prior consistent statements after defendant testified that Jane Doe had falsely accused him because she was angry with him after an argument they had in March 2010. (Evid. Code, § 791, subd. (b).)

IV

CALCRIM No. 318

The trial court gave the jury an instruction based on CALCRIM No. 318:

"You have heard evidence of statements that a witness made before the trial. If you decide the witness made those statements, you may use those statements in two ways: [¶] 1. To evaluate whether the witness's testimony in court is believable; and [¶] 2. As evidence that the information in those earlier statements is true."

Defendant contends the instruction erroneously allowed the jury to consider Mariah's testimony and Jane Doe's letter as truth of the matter asserted. We conduct an independent review to determine whether there is a reasonable likelihood the jury misconstrued or misapplied the law. (*People v. Federson* (2010) 188 Cal.App.4th 625, 642; *People v. Fiu* (2008) 165 Cal.App.4th 360, 370.)

As explained above, the evidence admitted under the fresh-complaint doctrine cannot be considered for the truth of the matter asserted. (*People v. Brown, supra,* 8 Cal.4th at pp. 759-760.) On the other hand, CALCRIM No. 318 allows hearsay evidence

10

to be admitted if a witness has been confronted by prior inconsistent statements. (Evid. Code, §§ 770, 1235.)

Here defense counsel questioned Jane Doe about why she did not initially disclose the oral copulation to the police and why she made contradictory statements about whether defendant wore a condom. Defense counsel also challenged Jane Doe and Mariah about whether Jane Doe confided in Mariah in 2008 or 2009. Therefore, Jane Doe's statements to Mariah and the letter were both admissible to explain the inconsistent statements offered by both witnesses.

Furthermore, any error was harmless as previously discussed above because the subject evidence was cumulative and the inculpatory evidence against defendant was overwhelming.

V

REGISTRATION AS A SEX OFFENDER

Defendant was convicted of one count under section 288, subdivision (c)(1), and one count under section 288a, subdivision (b)(2)—both of which trigger mandatory registration as a sex offender. (§ 290, subds. (b), (c).) His other two convictions under section 261.5 do not trigger mandatory registration. Defendant argues that he cannot be required to register based on his conviction under section 288, subdivision (c)(1), because he was not required to register for his conviction under section 261.5, subdivision (d). We conclude that because he was actually convicted under section 288, subdivision (c)(1), mandatory registration applies.

11

In *People v. Hofsheier* (2006) 37 Cal.4th 1185, the California Supreme Court found an equal protection violation in the nondiscretionary requirement of lifetime registration for a conviction for violating section 288a, subdivision (b)(1) (voluntary oral copulation with a minor under age 18), because there was no mandatory registration for a violation of section 261.5 (unlawful intercourse with minor under age 18). The court held no rational basis exists for the distinction between these two groups: adults who commit voluntary oral copulation with a minor under 18, and those who commit voluntary intercourse with such a person. (*Hofsheier,* at p. 1201.) The trial court was directed to determine whether to require registration under the discretionary registration statute. (*Id.* at p. 1208.) The same equal protection reasoning was applied in *People v. Garcia* (2008) 161 Cal.App.4th 475, 481 for a conviction under section 288a, subdivision (b)(2) (oral copulation with a minor under age 16).

The present case, however, is properly governed by *People v. Anderson* (2008) 168 Cal.App.4th 135, and *People v. Cavallaro* (2009) 178 Cal.App.4th 103, 109-118, involving defendants actually convicted of violating section 288, subdivision (c)(1), making them subject to mandatory registration. This court adopted the same reasoning in *People v. Alvarado* (2010) [Fourth Dist., Div. Two] 187 Cal.App.4th 72, 76-79.)

We cite to part of the comprehensive discussion of this issue in *Cavallaro*, as follows:

"Defendant here argues that *Hofsheier* is nonetheless applicable because he—as a person convicted under section 288(c)(1) where sex offender registration is required—is similarly situated with persons of the same age convicted of unlawful, nonforcible sexual

intercourse with a 14 or 15 year old under section 261.5, subdivision (d). Defendant's analysis is flawed for at least four reasons, and we thus conclude that he is not similarly situated with another group of convicted persons who receive different treatment under the sex offender registration statute.

"First, as we noted in *Anderson, supra*, 168 Cal.App.4th at page 142, section 288(c)(1) includes a specific intent requirement. A lewd or lascivious act committed on a 14 or 15 year old by a person at least 10 years older is punishable under section 288(c)(1), where the person does so 'with the intent described in . . . subdivision [(a)],' namely, 'with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child . . . .' (§ 288, subd. (a).) No such specific intent element is present for the offense of unlawful sexual intercourse under section 261.5, subdivision (d). [Citations.] The higher mental state required for a conviction under section 288 is a distinction that is meaningful in deciding whether a person convicted under that statute is similarly situated with one convicted under section 261.5.

"Second, there is a threshold age requirement for the offender under section 288(c)(1): the defendant must be at least 10 years older than the minor victim. The age of a defendant may provide a meaningful distinction in providing for different treatment of criminal offenses in certain instances. [Citation.] The age prerequisite under section 288(c)(1) is not present under section 261.5, subdivision (d), where the defendant need only be 21 years of age. The Legislature could have properly concluded that it was necessary to specifically prohibit sexual conduct between a 14 or 15 year old and an adult at least 10 years older and to include mandatory sex offender registration based upon a

13

conviction for the offense, because of the potential for predatory behavior resulting from the significant age difference between the adult and the minor.

"Third, as we also noted in *Anderson, supra*, 168 Cal.App.4th at page 142, the ages of the victims involved here—14 and 15 years old—are different than the victim in *Hofsheier* (16). This age difference of the minor, in addition to the age span between the minor and the defendant, is of significance in determining whether *Hofsheier* is applicable to the equal protection challenge here. In this regard, we find the Fifth District Court of Appeal's comments useful: 'We see in this statutory background a legislative desire to protect 14- and 15-year-olds from predatory older adults to the same extent children under 14 are protected by subdivision (a) of section 288. [Citation.] Subdivision (c) (now (c)(1)) was enacted to make the lewd conduct proscribed by subdivision (a) subject to felony punishment when committed on slightly older victims by considerably older adults. The inclusion of the decade age difference in the subdivision reflects a recognition that a "sexually naïve" [citation] child of 14 or 15 could fall victim to a more experienced adult, a vice the Legislature was attuned to and took action to prevent.' (*People v. Paz* (2000) 80 Cal.App.4th 293, 297.)

"Fourth, and perhaps most significantly, a person who engages in sexual intercourse with a 14 or 15 year old and who is also at least 10 years older than the minor may be convicted of a lewd or lascivious act under section 288(c)(1). (*People v. Fox* (2001) 93 Cal.App.4th 394, 399, [sexual intercourse is lewd act under § 288].) Therefore, contrary to defendant's position, he, as a person convicted under section 288(c)(1), is not similarly situated with a group of persons who are not subject to

14

mandatory registration for the commission of sexual acts with minors of the same age as the victims here. Stated otherwise, had defendant had sexual intercourse with K. or S., he would still have been subject to prosecution under section 288(c)(1) for the commission of a lewd act, a crime for which sex offender registration is mandatory." (*People v. Cavallaro, supra,* 178 Cal.App.4th at pp. 113-115.)

The four reasons outlined in *Cavallaro* apply equally in this case where defendant was actually committed of violating section 288, subdivision (c)(1), in addition to section 261.5. Section 288 requires a higher mental state— a specific intent requirement—not present in section 261.5. Also significant is the age differential between defendant, who was more than 10 years older than the victim, who was under 16, another meaningful distinction as articulated in *Cavallaro*. Particularly, the Legislature could have concluded the age differential justified mandatory registration because of the increased potential for predatory behavior between an older defendant and a much younger victim. Greater protection is also afforded to children of 14 or 15 by requiring mandatory registration for violations of section 288, subdivision (c)(1).

To paraphrase slightly this court in *People v. Alvarado, supra,* 187 Cal.App.4th at page 79: here, there is no equal protection violation in imposing mandatory registration for defendant's section 288, subdivision (c)(1), conviction. Defendant fails to establish any similar crime in which mandatory registration is not required. Defendant has not shown that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner. (*People v. Hofsheier, supra*, 37 Cal.4th at p.

15

1199.) A section 261.5 offense concerns the general intent offense of committing unlawful sexual intercourse.

Contrary to defendant's position, mandatory registration is appropriate for defendant based on his conviction under section 288, subdivision (c)(1), even if under *Hofsheier* he was not subject to mandatory registration for his convictions under sections 288a and 261.5.

## VI

## SECTION 4019

Defendant committed his crimes before October 1, 2011, when section 4019 was amended. According to the version of section 4019 in effect when he committed the offense, he was entitled to two days of custody credit for every actual day in custody under section 4019. Because he is required to register as a sex offender under section 290, he is not entitled to credits under section 2933, subdivision (e)(1). Prospective application of section 4019 does not violate federal or state equal protection. (*People v. Brown* (2012) 54 Cal.4th 314, 328.) Defendant raises this issue only to preserve his federal remedies.

Defendant's rational basis argument was also emphatically rejected in *People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 55-56, approving the Legislature's legitimate state purpose of reducing costs. The California Supreme Court has stated equal protection of the laws does not forbid statutes and statutory amendments to have a beginning and to discriminate between rights of an earlier and later time. (*People v. Floyd* (2003) 31 Cal.4th 179, 188.) "[I]n choosing October 1, 2011, as the effective date

16

of Assembly Bill No. 109, the Legislature took a measured approach and balanced the goal of cost savings against public safety. The effective date was a legislative determination that its stated goal of reducing corrections costs was best served by granting enhanced conduct credits to those defendants who committed their offenses on or after October 1, 2011. To be sure, awarding enhanced conduct credits to everyone in local confinement would have certainly resulted in greater cost savings than awarding enhanced conduct credits to only those defendants who commit an offense on or after the amendment's effective date. But that is not the approach the Legislature chose in balancing public safety against cost savings. [Citation.] Under the very deferential rational relationship test, we will not second-guess the Legislature and conclude its stated purpose is better served by increasing the group of defendants who are entitled to enhanced conduct credits when the Legislature has determined the fiscal crisis is best ameliorated by awarding enhanced conduct credit to only those defendants who committed their offenses on or after October 1, 2011.

"Finally, *In re Kapperman* (1974) 11 Cal.3d 542, is of no help to [defendant] as that case involved actual credits and not conduct credits. Conduct credits must be earned by a defendant, whereas custody credits are constitutionally required and awarded automatically on the basis of time served. (*Brown, supra*, 54 Cal.4th at p. 330.)" (*People v. Rajanayagam, supra,* 211 Cal.App.4th at pp. 55-56; *People v. Verba* (2012) 210 Cal.App.4th 991, 996-997; *People v. Kennedy* (2012) 209 Cal.App.4th 385, 395-400.)

17

VII

DISPOSITION

The trial court did not commit evidentiary or instructional error involving the hearsay evidence. Defendant is subject to mandatory registration as a sex offender based on his conviction for violating section 288, subdivision (c). Defendant is not entitled to additional custody credits.

We affirm the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

HOLLENHORST
Acting P. J.

RICHLI
J.

18