Filed 4/17/15  P. v. Jbara CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E060528 |
| v. | (Super.Ct.No. FVA1200846) |
| BAHA RAJEH JBARA, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Daniel W. Detienne, Judge.  Affirmed.

Marilee Marshall & Associates and Marilee Marshall under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Stacy Tyler, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant and appellant Baha Rajeh Jbara[1] appeals after the trial court denied his motion to withdraw his plea in a case arising from an episode of severe domestic violence. We affirm the trial court's denial of defendant's motion to withdraw his guilty plea.

FACTS AND PROCEDURAL HISTORY

The facts are taken largely from evidence presented at the preliminary hearing. In June 2012, the victim, Jane Doe, and her husband Alaa Jbara (defendant's brother), together with defendant and his wife, Haleema, and each couple's respective children, all shared an apartment in Rialto. The incidents in question occurred from the evening of June 14 to some time on the morning of June 15, 2012.

On the evening of June 14, Alaa and Jane Doe argued about the children not getting along with their cousins. Alaa also planned that evening to visit a relative who had come from overseas, and he refused to let Jane Doe go with him. When defendant and Haleema said they were going with Alaa on this visit, then Alaa insisted that Jane Doe "get dressed," because she was to go too. Jane Doe then refused to go, because Alaa had initially told her she could not go.

Jane Doe started to go upstairs. Alaa was angry and yelled at her that she did not listen to him and obey him, and she was not a good wife. He followed her up the stairs

_____

[1] In the declaration of defendant, re change of plea, defendant signs his first name "Baha." As this form was signed under penalty of perjury, we therefore use "Baha" as the correct spelling.

and, in the stairwell, punched her in the head with his fist. They proceeded upstairs, and defendant and Haleema followed.

At first, defendant tried to separate his brother from Jane Doe, but Jane Doe said it was none of his business. After that, defendant told Alaa to do whatever he wanted and to beat Jane Doe up. While Jane Doe yelled, both Alaa and defendant hit and punched her. Defendant grabbed her by the jaw because she was talking back. Haleema closed the blinds, because people outside were starting to gather at hearing the commotion.

Haleema grabbed Jane Doe by the shoulders; Jane Doe pushed her away, and kicked and hit her. Haleema then said that Jane Doe deserved to be beaten. Because Jane Doe was screaming and yelling, defendant tried to gag her. Defendant tried to scare Jane Doe by telling his brother that they would cut her in pieces and throw her in the dumpster.

At some point, Alaa dragged Jane Doe to the bathroom and shut her inside. She screamed at him to let her out. She could not turn the doorknob because someone was holding it from the outside. Alaa came into the bathroom and punched Jane Doe several times. Alaa then left the bathroom. Jane Doe was bleeding from the mouth and nose, and her head was cut open.

Defendant also came into the bathroom at another point, and he slapped Jane Doe. He put his hands around her neck with his fingers on her mouth, trying to silence her. Jane Doe fought back, hitting and scratching defendant. When defendant left the

3

bathroom, Jane Doe was slumped on the floor. She could not get up without assistance, and her vision was going in and out of focus.

Later, Jane Doe was able to leave the bathroom, and went to the master bedroom. She saw Alaa's mobile phone on the dresser, and reached for it. Defendant saw Jane Doe holding the phone, and exclaimed, "You're going to call [the] police on us?" He stomped on Jane Doe's shoulder, causing her so much pain that she could not lift her arms.

Some time later, after defendant and Haleema had left the room, Alaa fell asleep. He awoke in the night when their baby cried, and left the room, carrying an empty bottle. While Alaa was downstairs, Jane Doe got Alaa's mobile phone and dialed 911. Jane Doe asked for an ambulance, and for the dispatcher to send someone right away. Jane Doe rung off so that she would not be overheard.

Police and paramedics arrived a few minutes later. Jane Doe was treated for a broken nose, a broken collar bone, two broken ribs, an open cut head fracture, and multiple contusions.

After a preliminary hearing, the People filed an information charging defendant, Alaa, and Haleema with the crime of torture (count 1) (Pen. Code, § 206), charging Alaa with corporal injury to a spouse (count 2) (Pen. Code, § 273.5, subd. (a)), charging defendant and Haleema with assault by means of force likely to cause great bodily injury (count 3) (Pen. Code, § 245, subd. (a)(4)), and charging all three codefendants with false imprisonment (count 4) (Pen. Code, § 236). As to count 2, the information alleged that Alaa personally inflicted great bodily injury on Jane Doe (Pen. Code, § 12022.7,

4

subd. (e)), and as to count 3, the information alleged that defendant had personally inflicted great bodily injury on Jane Doe (Pen. Code, § 12022.7, subd. (a)).

The People offered a "package" plea bargain to all of the codefendants: Defendant and Alaa would each plead guilty to counts 2 and 3, and admit a great bodily injury enhancement with respect to each, with a stipulated prison term of 12 years. In exchange, the torture count, which carried a potential indeterminate life sentence, and the false imprisonment count would be dismissed. Haleema was offered the opportunity to plead guilty to assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)), a strike conviction, and be placed on three years' probation. The remaining charges would be dismissed. All three codefendants would have to agree to accept the plea bargain; if any of them declined the bargain, the agreement would be rescinded as to all three.

All three defendants did agree to accept the package bargain; each plea was made pursuant to *People v. West* (1970) 3 Cal.3d 595. In *People v. West*, the California Supreme Court approved plea bargains in general, and also held that a trial court could accept a plea to a charged offense, or to any lesser offense reasonably related to the charged offense. The court referred the matters to the probation department for reports, and set a sentencing hearing date.

At the time of the sentencing hearing, defendant indicated he wished to withdraw his plea. The court set a new hearing date for the withdrawal motion. Defense counsel filed a formal written motion to withdraw the plea on May 7, 2013. The motion indicated that, when defendant was interviewed by the probation department, he said he "did not do

5

it." Defendant also felt he had no choice, because his attorney advised him that he would get a life sentence if he did not sign the agreement. Defense counsel also made an offer of proof, to the effect that he expected defendant to testify that he did not adequately understand the Arabic interpreter during the plea proceedings; defendant felt forced to sign the plea, both by his attorney and by the interpreter.

The People opposed the motion to withdraw the plea. The prosecutor argued that defendant had not shown good cause to withdraw his plea, as there was no clear and convincing evidence that defendant had labored under any mistake, ignorance, duress, or other matter sufficient to overcome his exercise of free judgment in accepting the plea.

The court held a hearing on the motion to withdraw the plea. Defendant testified. The attorney who had represented defendant at the plea proceedings also testified. The court denied defendant's motion to withdraw the plea.

The court later imposed the agreed-upon sentence of 12 years in prison.

Defendant filed a notice of appeal and requested a certificate of probable cause, contending that the trial court erred in denying defendant's motion to withdraw his plea. The trial court granted the certificate of probable cause.

ANALYSIS

I. Standard of Review

Penal Code section 1018 provides in relevant part: "On application of the defendant at any time before judgment, . . . the court may, . . . for a good cause shown, permit the plea of guilty to be withdrawn and a plea of not guilty substituted."

6

"The general rule is that the burden of proof necessary to establish good cause in a motion to withdraw a guilty plea is by clear and convincing evidence. [Citations.] [¶] 'Withdrawal of a guilty plea is left to the sound discretion of the trial court. A denial of the motion will not be disturbed on appeal absent a showing the court has abused its discretion.' [Citations.] [¶] To establish good cause, it must be shown that defendant was operating under mistake, ignorance, or any other factor overcoming the exercise of his free judgment. [Citations.] Other factors overcoming defendant's free judgment include inadvertence, fraud or duress. [Citations.] However, '[a] plea may not be withdrawn simply because the defendant has changed his mind.' [Citations.]" (*People v. Huricks* (1995) 32 Cal.App.4th 1201, 1207-1208.)

II. <u>The Trial Court Did Not Abuse Its Discretion in Denying Defendant's Motion to</u>
<u>Withdraw His Plea</u>

Defendant's written motion to withdraw his plea recited the following factors to support his claim of good cause to withdraw his plea. First, when he was interviewed by the probation department, defendant claimed that he "did not do it." Second, defendant claimed he accepted the plea agreement "because his attorney said he would get life if he did not sign for 12 years." Third, defendant said he did not understand the American legal system. " 'They hold me nine months and I didn't do it. Everybody pushed me to sign, I didn't do it. Nobody talked to me. I told my attorney, but they said I did it. They have attached me to my brother's sentence and it's not right.' "

In describing the offenses, however, defendant related that his brother and the victim were arguing because she was not listening and she would not obey. The victim tried to hit her husband with her sandal. Defendant intervened, pushing the couple apart. The victim fell against the wall. The victim continued yelling and cursing. Defendant's brother was beating the victim. Defendant held her chin and told her to shut up. He said, " 'She kept screaming so I slapped her face.' " Even though defendant repeatedly told the probation officer that he didn't do it, his own account of events showed he had at least slapped the victim and pushed her into a wall.

At the hearing on defendant's motion to withdraw his plea, defendant testified on his own behalf. He stated that he wanted to withdraw his plea, "Because I was accused and the charges was some kind of—and I didn't do it. And beside that, I didn't have any choice unless I signed that plea, because that was including my wife and my brother. [¶] And beside that, my lawyer told me if I didn't sign, I may serve all my life in the jail. And he told me it is better for you to sign it, and he convinced me in a strange way to sign it. And I was confused." Defendant admitted, however, that he was able to understand the Arabic interpreter at the plea proceeding, "[b]ut she didn't explain to me every item in that plea bargain." Defendant was told the name of the charges, and the number, but no other explanation was given to him. Defendant admitted on cross-examination that he signed the plea agreement to avoid being sentenced to life in prison. Defendant claimed his attorney had visited him "a couple times" in the jail. The attorney visited defendant without an interpreter, and no visit lasted more than five minutes.

8

The attorney that had represented defendant at the plea proceedings testified for the People. The attorney related that there had been various plea negotiations with respect to the case. At one point, the prosecutor had offered a sentence of 15 years; the attorney conveyed the offer to defendant, and defendant had rejected that offer. Later, the 12-year sentence was offered. The attorney, with the help of an interpreter, spoke to defendant at some length about the offer. The attorney explained that the offer was a package deal for all three codefendants. If any of the defendants declined to accept the bargain, the case would go to trial. The attorney explained that defendant was risking a possible life sentence if he were found guilty. Eventually, defendant "reluctantly" agreed to accept the bargain.

The attorney testified that he presented the plea agreement form, line by line, to defendant, through the interpreter. The attorney also stated that defendant was able to speak up when he disagreed with anything during the negotiations; for example, he rejected the 15-year plea bargain. "And he wasn't too happy about 12 years but I had to explain the risks to him, which I did."

The attorney also contradicted defendant's claim that the attorney had spoken to defendant at the jail only two times, for about five minutes each. The attorney described three meetings. The first meeting took place with both defendant and Alaa, the attorneys for both defendant and Alaa, and an interpreter. That meeting took about one hour. The attorney met with defendant at least two additional times. "It was kind of difficult without him speaking too much English, but we tried [to communicate]." The victim had

testified extensively at the preliminary hearing; upon reviewing her testimony, including cross-examination, defendant's attorney felt it would be in defendant's best interest to avoid going to trial, and subjecting defendant to a potential life term on the torture count. The attorney stated that he fully explained the charges to defendant, including the definition of torture in plain language. Defendant "seemed to understand" the plea form as the attorney and the interpreter explained it to defendant.

At the plea proceedings, the court had inquired extensively about defendant's understanding of all his rights, and of the consequences of the plea. The court specifically asked defendant if he were making the plea of his own free will, and not as the result of any pressure, "or because you're doing it because you want to do a favor for one of your co-defendants, or because one of your co-defendants pressured you." Defendant's initial response was, "This is what God has chosen for me," but defendant's attorney specifically asked for clarification that defendant agreed to the bargain as in his "own self best interests," and not to help one of the codefendants or because of pressure from a codefendant. Defendant expressly stated "Yes," to the query whether he made the agreement of his own free will. Defendant also agreed that he had had sufficient time to discuss the plea bargain, his rights, and the consequences of the plea, with his attorney.

Based on all the evidence, the trial court found no good cause to withdraw the plea. Defendant had had everything explained in detail to him. Defendant was able to understand the interpreter. Defendant's brother asked for clarification about what a strike offense was, and the court had explained it. Defendant was present for that question and

10

explanation. The court explained the risk of a life sentence if defendant were convicted of the torture count at a trial. The bargain "made perfect sense," given the very credible testimony of the victim and the severity of the potential sentence. Extensive negotiations had taken place for the attorneys to achieve the best bargain they could for their clients; 12 years was the best offer they received. The court found that defendant fully understood that he was pleading guilty to a term of 12 years, "to avoid possibly going to prison for life."

The trial court did not abuse its discretion in denying defendant's motion to withdraw his guilty plea. It was defendant's burden to provide clear and convincing evidence of some good cause for withdrawal, such as ignorance, duress, or circumstances overbearing his free will. Defendant failed to provide such evidence.

Despite defendant's claims of innocence, his own description of events conceded at least some physical violence toward Jane Doe, the victim. In addition, all the pleas were taken pursuant to *People v. West*, *supra*, 3 Cal.3d 595, which permits the court to accept a voluntary plea of guilty or nolo contendere to related offenses, other than the actual offenses charged. "A defendant who knowingly and voluntarily pleads guilty or nolo contendere can hardly claim that he is unaware that he might be convicted of the offense to which he pleads; his plea demonstrates that he not only knows of the violation but is also prepared to admit each of its elements. (See *In re Hawley* (1967) 67 Cal.2d 824, 828 [63 Cal.Rptr. 831, 433 P.2d 919].) Although we could speak of defendant's plea as an 'implied' amendment of the information to add the charge to which defendant

11

pleads (see, e.g., *People v. Powell* [(1965)] 236 Cal.App.2d 884, 888), we see no need to fashion such a fiction; we hold that the court, in accepting a knowing and voluntary plea of guilty or nolo contendere, is not limited in its jurisdiction to the offenses charged or necessarily included in those charged." (*People v. West*, *supra*, 3 Cal.3d at pp. 612-613.) Even if defendant claims he is innocent of some aspects of the charges to which he pleaded guilty, the plea was shown by the evidence to be voluntary and knowing, and was based on defendant's assessment of his best interest in accepting the plea. (Cf. *People v. Manning* (2008) 165 Cal.App.4th 870, 879 [Fourth Dist., Div. Two] [excluding proffered expert testimony to the effect that "a *People v. West* plea does not admit the underlying facts, but is entered because it is in the best interest of the accused"].)

Defendant's claims that nothing was properly explained to him were belied by the testimony of his attorney and by the record of the plea proceedings. Defendant's attorney explained the charges, defendant's rights, the potential exposure, the consequences of a plea, and each line of the plea agreement form. Defendant understood the interpreter who translated these explanations. The court conducted an extensive inquiry to be sure that defendant's plea was knowing and voluntary, that he understood his rights, that he was not coerced or pressured into making the plea, and so forth. Defendant failed to present clear and convincing evidence that the plea was induced by ignorance.

The record also does not substantiate that counsel overbore defendant's free will. Although defendant was initially reluctant to enter into the agreement, and it was a package deal that also affected his wife and his brother, the leniency offered and its effect

12

on all the codefendants does not invalidate the plea. (See *People v. Huricks*, *supra*, 32 Cal.App.4th 1201, 1208 [the defendant was not subjected to " 'overbearing duress' " because his family asked him to take the plea bargain].) Defendant's attorney did not improperly tell him that his choice was either 12 years or a life sentence. Rather, the attorney explained the exposure of the torture offense, and the risk defendant would be taking by going to trial. That defendant accepted his attorney's advice does not show that his free will was overborne. (See *People v. McDonough* (1961) 198 Cal.App.2d 84, 91 ["And the fact that a defendant's attorney has recommended that he enter a plea of guilty is in itself no basis for later setting aside the plea"].)

As the People have pointed out, "[a]ll decisions to plead guilty are heavily influenced by difficult questions as to the strength of the prosecution's case and the likelihood of securing leniency." (*People v. Breslin* (2012) 205 Cal.App.4th 1409, 1417.) All the evidence shows that his plea was intelligently made, taking full account of these issues. Defendant's plea was valid; the trial court did not abuse its discretion in denying his motion to withdraw his plea.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
J.

We concur:


RAMIREZ
P. J.


KING
J.

14