Filed 6/20/13  P. v. Ramos CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B240682 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA372152) |
| v. | |
| JOSE R. RAMOS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court for Los Angeles County, Frederick N. Wapner, Judge.  Affirmed.

Richard A. Levy, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Timothy M. Weiner, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Jose R. Ramos appeals from a judgment sentencing him to 24 years in prison after a jury found him guilty of nine counts of lewd act upon a child under the age of 14. (Pen. Code,[1] § 288, subd. (a).) He contends the trial court (1) gave an erroneous instruction to the jury on evaluating witness demeanor; (2) erred by allowing evidence regarding the victim's disclosure of the abuse; (3) erred by failing to instruct on attempted lewd conduct and on battery as lesser included offenses; and (4) abused its discretion by denying defendant's motion for a new trial. He also contends that (1) his trial counsel was ineffective in failing to request a limiting instruction for the testimony regarding the victim's disclosure of the abuse; (2) the prosecutor committed misconduct by injecting a purported fact outside the record during closing argument and by asking inflammatory and irrelevant questions during defendant's cross-examination; and (3) there was insufficient evidence to support the conviction on one of the counts. We affirm the judgment.

## BACKGROUND

Tanya G. was born in November 1993. When she was five or six years old, she, her mother, and her sister Kathy began living with defendant, her stepfather.

Shortly thereafter, defendant began to come into Tanya's bedroom early in the morning when everyone else was asleep. He would pick her up and take her into the living room, where he would put his hands under her pajamas and underwear, put his fingers in her vagina, and move them up and down. After a while, he would pick her back up and put her in her bed. He did this several times a week (although he sometimes skipped a week) for about a year.

---

[1]     Further undesignated references are to the Penal Code.

Sometime later, defendant began to digitally penetrate Tanya when they were alone in the car. In one specific instance when Tanya was in fourth grade, defendant told Tanya to come with him to Home Depot. Before she got into the car, Tanya put on a pair of jeans that were hard to get into, to try to prevent defendant from touching her. When they were stopped at a traffic light, defendant tried to put his hand down her pants, but Tanya crossed her legs to make it harder. She saw a bicyclist approaching the car, and told defendant that she was going to yell at the cyclist if he kept trying. Defendant laughed, and used both hands to get into her pants and underwear, and put his fingers in her vagina. Defendant did this on at least five to ten occasions, both before and after the Home Depot incident; he stopped before Tanya became a teenager.

When Tanya was nine or ten, defendant began to have sexual intercourse with her. The first time, defendant took Tanya into her room when no one else was home. He put her on the floor, pulled down her pants and underwear, and had sexual intercourse. When he got up, he tried to hide his penis. When he realized Tanya saw it, he said "Ay caray," and laughed. He pulled up his pants, pulled up Tanya's underwear and pants, and walked out of the room. Later, he called her over to the tool shed in the back of the house. He told her that it should not have happened and that they should pray about it.

Another time, Tanya was passing by defendant's bedroom while defendant was coming out or going in. Defendant told her that he would give her a set of nail polishes if she would go into the room with him. She just stood there, but defendant pulled her in. He put her on the end of his bed and took off her pants and underwear, then pulled down his pants and underwear and had sexual intercourse. When it was over, he put her pants and underwear back on and she walked out while he sat down against the wall.

3

The next incident occurred when Tanya's younger brother was in the house; he was three to five years old.[2] Defendant was standing outside his room and told Tanya to come into the room. When she hesitated, he said it would only be for two seconds. She told him she would scream if was more than two seconds. They went into the room, and defendant locked the door. He put her on the edge of the bed, took off her pants and underwear, and had sexual intercourse. Then he lifted her shirt and put his mouth on her breasts, and then on her vagina.

During this last incident, and many other times beginning when Tanya was eight or nine, defendant kissed Tanya on the mouth and forced his tongue into her mouth. If he caught her wiping her mouth afterward, he would do it again and again until she stopped wiping her mouth.

In another incident of sexual intercourse that occurred when Tanya was 10 or 11, Tanya was alone in the house with defendant at night. She went into her bedroom to go to sleep while defendant was watching television. Defendant asked her if she was cold. She did not respond, and pretended to be asleep. Defendant went upstairs to her bedroom, lay down on the bed next to her, and began to rub her vagina, breasts, and stomach. He then took off all of her clothes and his clothes, put her on top of him with his penis inside her, and moved her body against him while kissing and touching her everywhere. When he was finished, he put her clothes back on and went downstairs.

Defendant had sexual intercourse with Tanya two or three more times before Tanya and her sister Kathy went to live with their father in Indio in 2007, when Tanya was in eighth grade. She lived with her father for two years, during eighth and ninth grades, and visited her mother and half-siblings during the summers.

---

[2] Defendant and Tanya's mother had three children: a boy (J.R.) and two girls (E.R. and M.R.).

4

During one of those summers, defendant tried to hug Tanya by picking her up and dragging her body down his body; it made her feel uncomfortable because she "felt like it was going to lead to something more because I knew it wasn't just a hug."

At some point after she had moved back in with her mother and defendant, Tanya overheard her younger sisters arguing about who was going to ask defendant to get them some doughnuts. After some back and forth, she heard E.R. say to M.R. that she was not going to ask "because [then] he's going to touch me." Until this time, Tanya had not told anyone about defendant's conduct with her because she did not want it to ruin her family, but hearing E.R.'s comment was a "turning point" for her, because she did not want anyone to go through what she had gone through.

In the spring of 2010, Tanya was participating in a program with a church youth group, during which she revealed that she had secret and asked the group to pray for her. The following Friday, Lamar Bass, a member of the group who was training to be a leader/mentor, saw Tanya in the prayer room, crying. Bass sat down with her, trying to calm her. Tanya revealed to him that she had been sexually molested by her stepfather, and she thought he was doing the same thing to her little sister. He told her she should tell her mother, but she refused; she was worried that it would break up her family. He asked her to talk to two youth leaders, Helen Carrillo and Tiffany Mariani, and Tanya promised that she would.

Tanya did not talk to either leader that day, but sometime shortly thereafter Carrillo, who was one of Tanya's "accountability partners," met with Tanya for one of their regular accountability meetings. During the meeting, Tanya kept alluding to her secret and was very emotional, on the verge of tears. Tanya would not say what the secret was, so Carrillo started asking her questions. When she asked Tanya if she was in danger, Tanya said that danger was not the word she would use. Carrillo then asked Tanya a series of yes-or-no questions: whether

5

someone was hurting her, whether it was physical, whether she was being physically abused at home, and whether it was her stepfather. Tanya answered yes to all of the questions.

Tanya also spoke to Mariani at around the same time. Mariani approached Tanya one night when she was crying at the end of a service. Mariani asked Tanya what was going on. Although Tanya did not say anything, Mariani seemed to know, and asked if she was being sexually molested, and whether it had progressed to rape. Tanya answered Mariani's questions. Mariani told her they needed to do something, and she made a plan to accompany Tanya on a certain date to tell Tanya's mother about the molestation.

Before that date, however, Tanya's sister Kathy overheard Tanya talking to a friend who had gone through a similar situation. Kathy heard Tanya tell her friend that her stepfather had been touching her and she needed to tell someone. The next day, Kathy told a teacher at school that her stepfather was touching one of her siblings.[3] The teacher took her to the principal's office, and the police were called.

Following an investigation by the police, defendant was charged by information with 11 counts of lewd act upon a child (§ 288, subd. (a)); nine counts related to Tanya,[4] and two counts related to two incidents involving

---

[3] Sometime that Spring, Kathy had overheard a conversation between J.R., E.R., and M.R. in which M.R. told J.R. that defendant had been touching E.R. She also had observed defendant give E.R. and M.R. extended kisses on their mouths against their wishes, and saw him go into the bathroom when E.R. or M.R. were taking showers or baths, even though the children were old enough to bathe themselves. Kathy did not do anything about her observations or what she heard because she did not know what to do.

[4] All of the counts were identical except for the date ranges during which the offenses occurred. Those date ranges are as follows. For counts 1 and 2, November 16, 1999 through November 15, 2001. For counts 3 and 4, November 16, 2001 through November 15, 2003. For counts 5, 6, 7, and 8, November 16, 2002 through November 15, 2006. For count 9, November 16, 2002 through November 15, 2007.

E.R.[5] The information included special allegations under section 1203.066, subdivision (a)(8), that defendant had substantial sexual contact with a victim (Tanya) who was under the age of 14, and that defendant had committed an offense specified in section 667.61, subdivision (c), against more than one victim within the meaning of sections 667.61, subdivision (b), and 1203.066, subdivision (a)(7).

At trial, defendant testified that he never engaged in any inappropriate touching or sexual relations with Tanya. He said that Tanya was jealous of the time he spent with the younger children and resented having to do chores around the house. He also testified that he and Tanya had issues about the way she dressed – he thought she dressed too provocatively – and that Tanya told him she wanted her mother to divorce him.[6]

In addition to his own testimony, defendant presented testimony from a forensic psychologist, Ronald R. Fairbanks, who administered several tests to defendant and offered his opinion that defendant is more unlike a child molester than like a child molester. Finally, defendant presented testimony from several people who knew him and attested to his good character.

In closing argument, the prosecutor provided suggestions as to which incidents that Tanya described could be used by the jury to convict defendant as to each count. She suggested the jury rely on the first incident Tanya described, where defendant picked her up, carried her into the living room, and put his fingers into her vagina, to convict defendant on count 1. She noted that Tanya testified that defendant had done this three to five times per week, and told the jury it could

---

[5] The jury could not reach a verdict on the two counts related to E.R., and they were dismissed. Therefore, we need not discuss the evidence related to those counts.

[6] Defendant also denied that he ever took Tanya (or any of his children) to Home Depot, saying that Home Depot was too dangerous for children.

7

use one of those times to convict defendant on count 2. She pointed to the Home Depot incident for count 3, and noted the jury could convict on count 4 based upon Tanya's testimony that there were at least five similar incidents in the car. For counts 5, 6, and 7, the prosecutor referred to the first three instances of sexual intercourse Tanya described. For counts 8 and 9, she explained that the jury could rely upon Tanya's testimony that, during at least one instance of sexual intercourse, defendant also kissed her breast and vagina. She also said that count 9 could be based upon the last incident of sexual intercourse that Tanya described (when Tanya pretended to be asleep). The prosecutor told the jury that it did not have to choose the acts that she suggested for each count, noting that Tanya had testified to multiple acts of kissing, oral copulation, and sexual intercourse, any of which the jury could choose for any of the counts as long as all of the jurors agreed on acts.[7] Almost as an afterthought, the prosecutor suggested that the jury could base a conviction for one of the counts on the sexual hug that occurred when Tanya was living with her father and visited during the summer.

The jury found defendant guilty on all nine counts related to Tanya, but could not reach a unanimous verdict as to the counts related to E.R. The jury also found not true the special allegation that defendant committed an offense against more than one victim. Defendant moved for a new trial. The trial court denied the motion and sentenced defendant to the high term of eight years on count 1, and two consecutive years on each of the remaining eight counts, for a total of 24 years. Defendant timely filed a notice of appeal from the judgment.

---

[7] The prosecutor gave as an example, that the jury could use Tanya's testimony about defendant kissing her for counts 2 and 4.

8

# DISCUSSION

A. *Instruction on Credibility of Witnesses*

After the jury was selected, the court addressed the jurors about the role of the jury in the trial, which it had alluded to during jury selection. The court reminded the jurors that it had said jurors acted as impartial judges of the facts, and told them that they would do this by determining the credibility of the witnesses.

The court explained that as jurors, they would "judge the facts by figuring out which witnesses you believe, and which witnesses you don't and how much weight or significance to attach to the testimony of each witness, and that you don't have to believe all the witnesses the same; but that you have to use the same rules for each witness." The court noted that the rules would be in a jury instruction it would read to them at the end of the case, but said it was "going to talk to you about them now and give you some examples so that as you listen to the witnesses testify, you'll have some idea of the kinds of things that you ought to be looking for."

The court continued: "It's not magic. It's common sense. You do it every day, you just don't think about it. So when you talk to somebody, and they're very serious about what they're saying, that's how you take it. And if they're very flip about what they're saying, that's how you take it. And it's the same with witnesses in this case. [¶] When you talk to someone, and the longer you talk, the more nervous they get. And they won't stand still; and they won't look [you in] the eye; and pretty soon there's sweat pouring off them. Now you understand that this is a gross exaggeration, but you get the idea. And if they stand still; they look you straight in the eye; and they say something with a firm clear voice, that gives you a very different idea of whether they're telling the truth or not. And it's the same with witnesses in this case. [¶] Assume they do look you in the eye. And you look right back at them. You don't say anything, but you think to yourself, that's

9

not true.  I wasn't born yesterday.  And you're gonna doubt that statement and everything else they say.  And it's the same with witnesses in this case."

Defendant contends on appeal that the court committed error by instructing the jury in this manner.  He argues that the instruction "improperly singled out specific aspects as factors that the jurors should find significant, thereby implying that other factors were less significant," contrary to the holdings of *People v. Dail* (1943) 22 Cal.2d 642, *Carlston v. Shenson* (1941) 47 Cal.App.2d 52, and *Fries v. American Lead Pencil Co.* (1904) 141 Cal. 610.  He argues that the more significant error, however, is that the court "made clear" that nervousness, fidgeting, and gaze aversion showed deceit, while the absence of those traits showed truthfulness.

We disagree with defendant's characterization of the court's comments.  The court did not "single out" factors that the jury should find significant.  The court simply instructed the jurors to evaluate the witnesses' demeanor in the same manner they evaluate other people's demeanor in their everyday lives.  And contrary to defendant's assertion, the court did not "make clear" that nervousness, fidgeting, and gaze aversion showed deceit, while the absence of those traits showed truthfulness.  Indeed, in a portion of the court's discussion that defendant omitted from his appellant's opening brief, the court used as an example of how a juror should assess a witness' credibility just as he or she would assess a person's demeanor generally, a situation in which the juror does not believe a person even though that person looks the juror directly in the eye.

In any event, the court properly instructed the jury with CALCRIM No. 226 before deliberations began, specifically noting that this instruction was the one it had referred to earlier.  While the court was reading the instructions to the jury, it paused when it reached CALCRIM No. 226 and said:  "Before we started the testimony, after we got the jury picked, I talked to you about the factors you could

consider in evaluating a witness' credibility, and I gave you some examples; and I said that when the case was over, I would read you a jury instruction that had those factors in this. So this is the instruction I was talking about." The court proceeded to read the pattern instruction. That instruction correctly tells the jurors, as the trial court did earlier, to use their common sense and experience in deciding whether a witness' testimony is true and accurate, and provides some factors the jurors may consider, including the witness' behavior while testifying. We find no error in the trial court's pretrial instructions.

B.      *Admissibility of Evidence of Tanya's Disclosure of Abuse*

Defendant contends the trial court committed prejudicial error by admitting the testimony of Bass and Carrillo, from the church youth group, regarding Tanya's disclosure of defendant's abuse. He argues that this testimony did not have any "specific relevance" to a contested issue, since those disclosures did not trigger the police investigation, and therefore the testimony was inadmissible hearsay. We disagree.

In *People v. Brown* (1994) 8 Cal.4th 746 (*Brown*), the Supreme Court examined the history of the "fresh-complaint doctrine," which allowed the admission of evidence that a victim of a sexual offense had made a complaint of the injury. Under the doctrine, the evidence was admitted "only for a nonhearsay purpose, i.e., not to prove the truth of the content of the victim's statement but, rather, simply to show that a prompt complaint was made." (*Id.* at p. 755.) The justification for admission of the evidence was that "'[i]t is natural to expect that the victim of a crime would complain of it, and the prosecution can show the fact of complaint to forestall the assumption that none was made and that therefore the offense did not occur.'" (*Id.* at p. 756.) Although the Court found that this justification has been discredited, it nevertheless concluded that "so long as the

11

evidence in question is admitted for the *nonhearsay* purpose of establishing the circumstances under which the victim reported the offense to others, such evidence ordinarily would be relevant *under generally applicable rules of evidence*, and therefore admissible, so long as its probative value outweighs its prejudicial effect. (Evid. Code, § 352.)" (*Id*. at pp. 759-760.)  The Court noted, however, that "[t]he specific relevance of the extrajudicial-complaint evidence . . . must be shown in every case." (*Id.* at p. 763.)

In this case, defendant argues that Tanya's disclosures to Bass and Carrillo were not relevant because they "had nothing to do with the chain of events, such as how the police got involved."  Defendant takes too narrow a view of relevance. This case came down to Tanya's credibility.  There was no physical evidence of sexual abuse, no witnesses to the abuse, and defendant denied ever touching Tanya inappropriately.  In addition, the alleged abuse had gone on for many years, and there was a significant delay between the last instance of abuse and the first time Tanya ever told anyone about it.  As the Supreme Court explained in *Brown*, "when the victim of an alleged sexual offense did not make a prompt complaint but instead disclosed the alleged incident only some time later, evidence of the fact and circumstances surrounding the delayed complaint . . . may be relevant to the jury's evaluation of the likelihood that the offense did or did not occur.  In the absence of evidence of the circumstances under which the victim ultimately reported the commission of an alleged offense, the jury in many instances may be left with an incomplete or inaccurate view of all the pertinent facts." (*Brown*, *supra*, 8 Cal.4th at p. 761.)

Here, Bass' and Carrillo's description of the circumstances surrounding Tanya's disclosures to them -- how distraught she was, her reticence in telling them (or her mother) about the abuse, and her expression of concern about what would happen to her family as a result of her disclosure -- were relevant not only to

explain the reasons for her delay in disclosing the abuse, but also to the jury's evaluation of the credibility of both her testimony and defendant's testimony suggesting that Tanya made up the accusations because she was angry or jealous. Moreover, Bass' and Carrillo's testimony did not include any details about the alleged abuse itself; it was limited to Tanya's emotional state and the fact that she had disclosed to them that her stepfather had sexually abused her. Thus, it complied with the Supreme Court's directive that, "in light of the narrow purpose of its admission, evidence of the victim's report or disclosure of the alleged offense should be limited to the fact of the making of the complaint and other circumstances material to this limited purpose." (*Brown*, *supra*, 8 Cal.4th at p. 763.)

Defendant's assertion that the testimony was inadmissible precisely because it focused in large part on Tanya's demeanor simply is wrong. The testimony about Tanya's demeanor was not hearsay. It was testimony about the witnesses' observations rather than about Tanya's out-of-court statements. That Tanya's distraught state and hesitancy to tell Bass or Carrillo about the abuse may tend to enhance Tanya's credibility as to the truth of her accusations against defendant does not render the testimony about the fact of her disclosure and her demeanor inadmissible.

Nor does the fact that the testimony focused on Tanya's emotional state render it inadmissible under Evidence Code section 352 as more prejudicial than probative, as defendant contends. "'Evidence is substantially more prejudicial than probative . . . [only] if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome" [citation].' [Citation.] '"The prejudice which . . . Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." [Citations.] "Rather, the statute uses the word in its

etymological sense of 'prejudging' a person or cause on the basis of extraneous factors.'" [Citations.]" (*People v. Eubanks* (2011) 53 Cal.4th 110, 144.) "'The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair.'" (*People v. Jablonski* (2006) 37 Cal.4th 774, 805.) Here, the evidence of the circumstances of Tanya's disclosures to Bass and Carrillo was relevant to explain the reasons for her delay in reporting the abuse, and her emotional state in particular was highly probative because it tended to contradict defendant's suggestion that Tanya made up the accusations against him because she resented having to do chores or was jealous of the time he spent with her younger siblings. The fact that this evidence might have had a powerful impact on the jury (or the trial court) in assessing Tanya's and defendant's credibility does not mean it was prejudicial within the meaning of Evidence Code section 352. In short, the trial court did not abuse its discretion in admitting Bass' and Carrillo's testimony. (*People v. Jablonski*, *supra*, 37 Cal.4th at p. 805 [trial court's ruling on admissibility of evidence is reviewed for abuse of discretion].)

C.      *Ineffective Assistance of Counsel*

When evidence of a victim's extrajudicial complaint has been admitted, counsel may request that the trial court instruct the jury as to the limited purpose for which the hearsay evidence was admitted. Absent such a request, the court is not required to give the instruction. (*Brown*, *supra*, 8 Cal.4th at p. 757.) In the instant case, defense counsel did not request a limiting instruction. On appeal, defendant contends his counsel provided ineffective assistance by failing to request the instruction.

"There are two components to an ineffective assistance of counsel claim: deficient performance of counsel and prejudice to the [defendant]. *Strickland v.*

14

*Washington* (1984) 466 U.S. 668, 697, informs us that 'there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.'" (*In re Cox* (2003) 30 Cal.4th 974, 1019-1020.) We conclude that defendant has not established he was prejudiced by his counsel's failure to request a limiting instruction.

Defendant argues his counsel's failure to request the limiting instruction was prejudicial for the same reason he contends Bass' and Carrillo's testimony should have been excluded in the first place: because the evidence of Tanya's demeanor when she disclosed the abuse to Bass and Carrillo tended to enhance her credibility. But this argument ignores that the *hearsay* for which a limiting instruction may have been appropriate was Tanya's statements to Bass and Carrillo that defendant had sexually abused her. Given that Tanya testified in detail about defendant's sexual abuse of her, it is not reasonably probable that a different result would have been reached had the jury been instructed that it could not consider Tanya's statements to Bass and Carrillo for their truth. (*People v. Manning* (2008) 165 Cal.App.4th 870, 880-881 [failure to give limiting instruction is harmless error where victim testified at trial].) Therefore, defendant was not prejudiced by his trial counsel's failure to request a limiting instruction.

D.    *Prosecutorial Misconduct*

Defendant contends the prosecutor committed prejudicial misconduct by "inject[ing] a purported fact that [was] not in evidence" during closing argument and asking inflammatory and irrelevant questions during defendant's cross-examination.  We disagree with defendant's characterization of the prosecutor's comment during closing argument, and find that the prosecutor's questions do not rise to the level of misconduct.

During closing argument, the prosecutor told the jury that the opinion offered by defendant's expert witness, forensic psychologist Ronald R. Fairbanks, that defendant is more unlike a child molester than like a child molester was "meaningless."  The prosecutor continued:  "Did you notice that he didn't actually tell you what the profile of a child molester is?  Well, what is it?  If he isn't, if he doesn't fit the profile, what is the profile?  What is it?  [¶]  And ladies and gentlemen, the bottom line is that there isn't one.  Because they come from all walks of life.  They're married; they're single; they're different occupations.  I mean, all you have to do is turn on the news:  Teachers.  Read the paper: neighbors, priests, all walks of life, ladies and gentlemen.  [¶]  When you watch the news . . . and there's some story about so and so has been arrested or convicted or whatever for being a child molester, who of the people interviewed said, I knew it? Everyone.  Neighbors, the friends:  I had no idea.  Oh, my god.  He seemed like -- he or she seemed like such a nice person.  It's totally unbelievable.  We trusted him or her.  [¶]  That's because, ladies and gentlemen, there isn't a profile.  Because child molesters, they have to pretend to be a certain person."

On appeal, defendant contends this statement was improper because the prosecutor did not present any expert testimony or other evidence that there is no such thing as a profile of a child molester, and therefore the prosecutor improperly referred to facts outside the record.  (See, e.g., *People v. Cunningham* (2001) 25

16

Cal.4th 926, 1026 ["A prosecutor commits misconduct by referring in argument to matters outside the record"].) Read in context, however, what the prosecutor appears to be saying is that there is no one "profile" into which all child molesters will fit -- a fact that the prosecutor elicited in her cross-examination of Dr. Fairbanks, who conceded that some child molesters may not fit the typical profile. There was no misconduct here. (*People v. Sanders* (1995) 11 Cal.4th 475, 526 ["We review prosecutorial remarks to determine whether there is a 'reasonable likelihood' that the jury misconstrued or misapplied the prosecutor's remarks"].)

With regard to the prosecutor's cross-examination of defendant, defendant points to a handful of questions asked by the prosecutor that he argues had no purpose other than to inflame the jury. While we agree that one of the questions was entirely inappropriate -- the prosecutor's final question to defendant: "Did you think about Tanya while you were having sex with your wife?" -- the remaining few questions about which defendant complains were not so objectionable as to give rise to a claim of prosecutorial misconduct.

""""A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.'"" [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ""'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'"""" (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

In this case, the questions at issue involved (1) the prosecutor challenging defendant's version of events by asking whether other witnesses had lied or were mistaken in their testimony; (2) a series of three questions in response to defendant's testimony that he never took his children to Home Depot because it was a dangerous place, in which the prosecutor asked variations of the question,

17

"Would you consider the home in which Tanya was sexually abused by you a dangerous place?"; and (3) a question about whether defendant reprimanded Tanya for dressing too provocatively because he wanted Tanya's body just for himself. These few questions, while in many instances objectionable[8] (and to which objections properly were sustained), neither violated due process nor were reprehensible. In short, defendant has not made out a case of prosecutorial misconduct.

E.     *Sufficiency of the Evidence on Count 9*

When suggesting to the jury which incidents it could rely upon to convict defendant on count 9, the prosecutor offered several possibilities, including one incident for which defendant contends there was insufficient evidence. Therefore, he contends the conviction must be reversed. Although we agree there was insufficient evidence that the incident at issue -- the so-called hugging incident, in which defendant picked Tanya up and dragged her down his body -- took place when Tanya was under the age of 14,[9] we disagree that the conviction must be reversed.

---

[8]     Questions asking whether other witnesses were lying are not categorically objectionable, particularly when the defendant being asked the questions knows the witnesses well and might know of reasons why the witnesses may lie. (*People v. Chatman* (2006) 38 Cal.4th 344, 382.)

[9]     Tanya testified that the incident occurred when she returned to visit her mother in the summer when Tanya was living in Indio with her father. She testified that she lived with her father for two years while she was in eighth and ninth grades, in 2007 through 2009. She was born in November 1993, and was about to graduate from 12th grade when she testified in March 2012. Thus, she was 13 years old when she started eighth grade in the fall of 2007. But because her birthday is in November, she was 14 years old by the summer after eighth grade. Although, as the Attorney General notes, Tanya testified that she was "12 or 13" when she visited the summer the incident occurred, that testimony cannot constitute substantial evidence that she was under 14 years old because it is a

18

Count 9 charged defendant with committing a lewd act upon Tanya "[o]n or between November 16, 2002 and November 15, 2007." Tanya testified to many incidents of abuse during that time period. She testified that defendant began having sexual intercourse with her when she was nine or ten years old, described four specific incidents – stating that in one of those incidents, after defendant had sexual intercourse with her he orally copulated her and put his mouth on her breasts -- and said there were two or three additional incidents of sexual intercourse, the last one of which occurred when she was 10 or 11 years old. She also testified that defendant started kissing her and forcing his tongue into her mouth when she was eight or nine, and that he did that "often." During closing argument, the prosecutor suggested that count 9 could be based upon defendant's kissing of Tanya's breast or vagina, the last incident of sexual intercourse Tanya described (when she pretended to be asleep), or the hugging incident, but also reminded the jury that Tanya had testified that there were two or three incidents of sexual intercourse or other lewd touching that she did not specifically discuss, any of which the jury could use to convict defendant.

A verdict based upon any of those incidents, other than the hugging incident, would be a factually sufficient ground for conviction. (See *People v. Jones* (1990) 51 Cal.3d 294, 314 ["even generic testimony (e.g., an act of intercourse 'once a month for three years') outlines a series of *specific*, albeit undifferentiated, incidents, *each* of which amounts to a separate offense, and *each* of which could support a separate criminal sanction"]; *People v. Matute* (2002) 103 Cal.App.4th 1437, 1445-1446.) "'Where the jury considers both a factually sufficient and a factually insufficient ground for conviction, and it cannot be determined on which ground the jury relied, we affirm the conviction unless there is an affirmative

mathematical impossibility. (Cf. *Bennett v. Chandler* (1942) 52 Cal.App.2d 255, 261-262.)

indication that the jury relied on the invalid ground.'" (*People v. Thompson* (2010) 49 Cal.4th 79, 119.) The reason for this is that "[a]n appellate court necessarily operates on the assumption that the jury has acted reasonably, unless the record indicates otherwise. [¶] . . . Thus, if there are two possible grounds for the jury's verdict, one unreasonable and the other reasonable, we will assume, absent a contrary indication in the record, that the jury based its verdict on the reasonable ground." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1127.)

Defendant argues that in the present case, the record provides an affirmative indication that the jury relied on the hugging incident, based on three factors: (1) the prosecutor argued that the jury could rely on the hugging incident; (2) the date range for count 9 (November 2002 to November 2007) ran one year longer than the date range for counts 5 through 8 (November 2002 to November 2006), and there was no reason for the additional year except to point the jury to the last incident, i.e., the hugging incident; and (3) the jury must have relied upon the specific incidents Tanya described rather than the generic ones because it was unable to reach a verdict until Tanya's and defendant's testimony was read back to it.

None of those factors, however, either alone or collectively, provides an *affirmative* indication that the jury relied upon the hugging incident in finding defendant guilty on count 9. Indeed, they constitute conjecture at best. Because we presume the jury acted reasonably, and relied upon a factually sufficient ground for its verdict on count 9, we must affirm the conviction.

F.    *Instruction on Lesser Included Offenses*

Defendant contends the trial court erred as to certain counts by failing to instruct the jury on attempted lewd conduct and battery as lesser included offenses to lewd conduct. He notes that the prosecutor suggested to the jury that it could

convict defendant on counts 2 and 4 based upon Tanya's testimony that defendant kissed her on several occasions, and that it could rely on the last incident that Tanya described -- when defendant hugged her by picking her up and dragging her body down his -- to convict him on count 9. He argues that the jury may have relied upon those incidents, and contends that the evidence regarding those instances could have constituted battery or attempted lewd conduct rather than the completed crime of lewd conduct. We need not address his argument as it relates to count 9 in light of our conclusion that the jury could not have relied upon the hugging incident in convicting him. And as to counts 2 and 4, defendant's argument is not persuasive.

"A trial court must instruct the jury sua sponte on an uncharged offense that is lesser than, and included in, a greater offense with which the defendant is charged 'only if [citation] "there is evidence"' [citation], specifically, '*substantial* evidence' [citation] '"which, if accepted . . . , would absolve [the] defendant from guilt of the greater offence" [citation] *but not the lesser*' [citation]." (*People v. Waidla* (2000) 22 Cal.4th 690, 733; see also *People v. Breverman* (1998) 19 Cal.4th 142, 162 [trial court must instruct on lesser included offenses only if there is substantial evidence ""from which a jury composed of reasonable [persons] could . . . conclude[]"' that the lesser offense, but not the greater, was committed"].)

We need not determine whether battery is a lesser included offense of lewd conduct -- a question about which appellate courts have disagreed (see, e.g., *People v. Thomas* (2007) 146 Cal.App.4th 1278, 1293-1294 [battery is a lesser included offense of lewd conduct]; *People v. Santos* (1990) 222 Cal.App.3d 723, 738-739 [battery is not a lesser included offense]) and which is currently before the California Supreme Court (see *People v. Gray*, review granted December 14, 2011, S197749; *People v. Shockley*, review granted March 16, 2011, S189462) -- or

21

whether defendant is correct that an attempted, rather than completed, violation of section 288 occurs when the perpetrator touches the victim with the intent to receive sexual gratification in the near future rather than immediately. Even if we assume that battery is a lesser included offense and that defendant is correct about what may constitute attempted lewd conduct, the acts at issue here cannot be found to constitute battery or attempted lewd conduct rather than completed lewd conduct. They either constitute actionable lewd conduct, or they are not criminal offenses at all.

With regard to the kissing incidents, in telling the jury that it could base convictions on counts 2 and 4 on defendant kissing Tanya, the prosecutor specifically referred to Tanya's testimony that defendant forced his tongue in her mouth when he kissed her. Such conduct cannot be deemed "merely affectionate, though certainly unwanted and offensive from her perspective," and therefore simply a battery, as defendant contends. Nor can it be characterized, as defendant posits, as offensive touchings that were only to facilitate defendant's sexual gratification in the near future rather than his immediate sexual gratification, and therefore attempted rather than completed lewd conduct. We agree with our colleagues in Division 7 of this District: "Unlike kissing without the use of tongues, which is an important means of demonstrating parental love and affection for a child, there can be no innocent or lovingly affectionate tongue kissing of a child by an adult." (*In re R.C.* (2011) 196 Cal.App.4th 741, 750-751.) Thus, to the extent the jury relied upon the kissing incidents described by Tanya, those incidents could only constitute completed lewd acts within the meaning of section 288, subdivision (a), rather than battery or attempted lewd conduct. Therefore, the trial court had no duty to instruct the jury on battery or attempted lewd conduct as lesser included offenses with regard to counts 2 and 4.

22

G.    *Denial of Motion For New Trial*

Defendant challenges the trial court's denial of his motion for a new trial. When ruling on a new trial motion, the trial court "independently examines all the evidence to determine whether it is sufficient to prove each required element beyond a reasonable doubt *to the judge*, who sits, in effect, as a '13th juror.'" (*Porter v. Superior Court* (2009) 47 Cal.4th 125, 133.) "'"'The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears.'" [Citations.] "'[I]n determining whether there has been a proper exercise of discretion on such motion, each case must be judged from its own factual background.'" [Citation.]'" (*People v. Howard* (2010) 51 Cal.4th 15, 42-43.)

In this case, defendant moved for a new trial on the grounds that (1) the incidents of sexual abuse were not established with sufficient specificity for the jury to determine which alleged acts were associated with each count, and (2) there was insufficient evidence to corroborate Tanya's testimony. The trial court denied the motion.

First, the court found that Tanya's testimony of specific incidents, combined with her generic testimony regarding other incidents, was sufficient for the jury to determine which incidents could be relied upon for each count. Next, the court explained that it acted as a "13th juror" and re-weighed the evidence, and concluded that it believed Tanya's testimony and disbelieved defendant's testimony. In doing so, the court noted that it had difficulty with some of the details Tanya gave about the touching incident in the vehicle on the way to Home Depot and some of the acts of sexual intercourse. But the court explained why it believed her testimony and disbelieved defendant: "[Defendant] testified and he lied. He just lied, flat out lied. Why would he lie? He didn't say I took her to the

23

Home Depot. We went to the Home Depot and nothing happened. He said I would never take my kids to the Home Depot. It's too dangerous. I've been to the Home Depot. I've taken my kids to the Home Depot. There are kids in strollers at the Home Depot. It's too dangerous? Are you kidding me? [¶] And then he says in his testimony, well, she's making it up because resentment of having to do the dishes. Come on. So why is he going to lie if he didn't do this? So then I go back to Tanya and I think, okay. She's young at the time. It happens. One of the problems in delayed reporting is that not only are you young, but you're likely to forget the details. Does she forget that she's molested? I don't think so. [¶] And what really did it for me, and this is pretty typical of most cases, okay. Let's get away from the defendant who is involved, the witness who is involved. Let's go to some independent witness. In this case we don't have an independent witness who saw the crime, but we have Mr. Bass who says that first one week she said that she had some secret and then she wasn't going to talk about it. And he comes in the next week and there's Tanya in the prayer room by herself and she's crying, uncontrollably crying. And he talks to her and then she reveals for the first time what happens. [¶] Now, if this is all done by her, she's made up the entire thing to get her father in trouble, then this has got to be a huge acting job and it's all planned out that she's intending to fool Mr. Bass into testifying for her and getting on her side by going into this acting job. I don't buy it for a minute. So I think that what happened to her happened to her. She's got some of the details wrong, but when I weigh all of the evidence, I believe the evidence proves beyond a reasonable doubt that he's guilty of all of these crimes."

On appeal, defendant contends the trial court denied his motion as to counts 3 and 4 based upon a fact not in evidence -- i.e., that Home Depot is not dangerous for children -- from which the court concluded that defendant was lying when he testified that he never took his children to Home Depot. He argues that, in doing

24

so, the court abused its discretion. (Citing *People v. Cluff* (2001) 87 Cal.App.4th 991, 998 ["A trial court abuses its discretion when the factual findings critical to its decision find no support in the evidence"].) Defendant misconstrues the trial court's comments.

The trial court's comments regarding Home Depot were not specifically directed at counts 3 and 4. Rather, they were made in the context of the court's discussion about the relative credibility of Tanya and defendant. Sitting as a "13th juror" and using its common sense and experience -- as the jury is instructed to do (see CALCRIM No. 226 ["In deciding whether testimony is true and accurate, use your common sense and experience"]) -- the court concluded that defendant's testimony that he never brought his children to Home Depot and that Tanya made up the allegations about abuse because she resented having to do the dishes was not believable. But more importantly, the court disbelieved defendant's denial of abuse because it believed Tanya's assertion of abuse, in part because of Bass' testimony regarding her demeanor when she disclosed the abuse for the first time.

Defendant contends in a separate argument, however, that the trial court's reliance on Bass' testimony to deny the new trial motion was an abuse of discretion. He argues that the court's consideration of Bass' testimony about Tanya's demeanor when she disclosed the molestation by defendant was improper because only the fact of the disclosure is admissible. (*Brown*, *supra*, 8 Cal.4th at p. 763.) For the reasons expressed in Section B., *ante*, defendant is incorrect. We conclude the trial court did not abuse its discretion by denying defendant's motion for a new trial.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

WILLHITE, J.

We concur:

EPSTEIN, P. J.

MANELLA, J.

26