[No. E042230. Fourth Dist., Div. Two. July 31, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
GARY LYNN MANNING, Defendant and Appellant.

COUNSEL

Andrew E. Rubin, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Rhonda Cartwright-Ladendorf and Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**HOLLENHORST, Acting P. J.—**

## I. INTRODUCTION

Defendant Gary Lynn Manning appeals from his conviction of battery on an institutionalized victim (Pen. Code,[1] § 243.4, subd. (b)). He contends the trial court erred in (1) admitting evidence of defendant's prior sexual offenses; (2) excluding expert testimony on the meaning of a *People v. West*[2] plea; and (3) failing to give a limiting instruction as to the victim's fresh complaint. We find no error, and we affirm.

## II. FACTS AND PROCEDURAL BACKGROUND

### A. *Current Offense*

On October 17, 2003, Jane Doe No. 1 had knee surgery at Arrowhead Regional Medical Center in Colton. Defendant was the student nurse anesthetist for her surgery. During the surgery, he stood near her upper body while the other members of the surgical team were by her knee, on the other side of a curtain that crossed her upper body. Jane Doe No. 1 testified that three times during the surgery, she woke up and felt defendant's hands under her hospital gown fondling and squeezing her breasts and nipples. While he was doing so, he asked her if it felt good.

After the surgery, when Jane Doe No. 1 was lying on a hospital bed in the recovery room, defendant came in and told her he needed to check her IV site. He pulled her left hand through the bed railing and placed it on the outside of his pants over his penis. She withdrew her hand. He then went to

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] From *People v. West* (1970) 3 Cal.3d 595 [91 Cal.Rptr. 385, 477 P.2d 409].

the other side of the bed and said he needed to check her blood pressure. He pulled her right arm through the railing and again placed her hand outside his clothing on his penis. She again withdrew her hand. As soon as he left, she called for a nurse.

Jane Doe No. 1 asked Marie Joy Orpilla, the staff nurse in charge of Jane Doe No. 1's care in the recovery room, whether it was usual for the doctor to "touch the chest" in the operating room. Jane Doe No. 1 seemed to be unsure if anything had actually happened in the operating room. Jane Doe No. 1 also told Orpilla that defendant "held her hand and rubbed it to him"; she did not indicate "what was getting rubbed." Orpilla testified it would not be unusual to touch a patient's breast when checking or replacing the EKG leads. Orpilla had seen defendant checking Jane Doe No. 1, and his arms were above the bed rail. Orpilla did not see anything inappropriate going on. Orpilla had never seen defendant with Jane Doe No. 1 with the curtain closed.

Carmelita Laoyan, another nurse who was working in the recovery room, heard that Jane Doe No. 1 had made a complaint. Laoyan went to Jane Doe No. 1 and said that her complaint would be taken care of. Jane Doe No. 1 said that "a guy who put her to sleep" had massaged her shoulders, touched her breasts under her hospital gown during the surgery and asked her if it felt good, and placed her hands on his penis in the recovery room. Jane Doe No. 1 was very upset and had teary eyes. The recovery room was a large open room with about 15 beds, very close together. Curtains could be drawn around the beds for privacy. There were at least 12 nurses on duty, and they constantly checked all the patients.

While in the recovery room, Jane Doe No. 1 told Meghan Ellis, an associate hospital administrator, that a man whose description fit defendant had put his hands under her gown and felt her nipples and had pulled her hand and put it in his crotch area twice in the recovery room. Ellis testified Jane Doe No. 1 had been "alert and clear" during their conversation, and Jane Doe No. 1 had also been upset and tearful.

Defendant's supervisor, Dale Reile, testified that there would have been five or more other members of the surgical team present in the operating room during the surgery. Reile himself made random and unannounced visits to the operating room during the surgery through a door by the head of the bed. Reile did not remember seeing defendant's hands on Jane Doe No. 1's chest, although that would not have been unusual. The nurse anesthetist monitors the EKG continuously. The patient has five EKG pads, one on each arm, two just under the breast area, and one lower. The pads are connected to wire leads, and if a lead becomes detached, the nurse anesthetist must manually reattach it, which requires putting the hand under the hospital gown.

The nurse anesthetist's job also entails keeping watch on the blood pressure cuff, the EKG, and the pulse oximetry. Blood pressure is checked every three minutes in the beginning and then every five minutes. The readings are recorded manually on the anesthetic record, and the record sheet for Jane Doe No. 1's operation was fully completed with readings every five minutes.

Gilbert Rocha was the circulating nurse during Jane Doe No. 1's surgery. He circulated throughout the operating room and around the bed, making sure everything was connected, assisted in the anesthesia, brought surgical supplies, and made sure the monitors were placed correctly. He was in and out of the operating room every few minutes and never saw defendant do anything inappropriate. Rocha testified he had not seen defendant's hands under Jane Doe No. 1's gown. He might have told Officer Juan Villescas he had seen defendant's hands on the patient to fix an inflatable blanket that had slipped. Additionally, whenever a lead becomes detached, a buzzing alarm sounds. Rocha did not recall any alarms going off during Jane Doe No. 1's surgery.

Officer Villescas interviewed Orpilla, Laoyan, Jane Doe No. 1, Rocha, and Reile at the hospital. Rocha told Villescas he had seen defendant touch Jane Doe No. 1 twice, once while fixing her blanket and once with his hands under her gown, but his hands were not moving. Defendant told Villescas he had had no problems with the EKG leads during the surgery and had no reason to put his hands under Doe's gown.

Jane Doe No. 1 told Villescas that her breast had been fondled four times, and she thought the person who had done so was named Wayne. She said she had at first thought she was in bed with her fiancé and that her fiancé was massaging her breasts and had asked her if it felt good. She had thought she must be dreaming.

Jane Doe No. 1 testified she was a longtime abuser of street drugs, and she had used crystal methamphetamine within the month before her surgery. She had been hospitalized for psychiatric problems half a dozen times in the six years before trial. She did not remember whether her January 2003 hospitalization for mental health reasons had been voluntary or involuntary. She had been diagnosed with bipolar disorder, attention deficit hyperactivity disorder (ADHD), posttraumatic stress disorder, and depression, and she suffered from panic attacks. She had also reported feeling she was disconnected from reality. In the six years before trial, she had also been on 10 to 20 different medications, including psychotropic medications, and she was on as many as eight different types of medications in the months before the surgery. When she was 21 years old, about 20 years before the surgery, she had reported being the victim of a gang rape by three "KKK Marines" in San Diego. The

case was never prosecuted. She testified she had been a victim of "about four" sexual assaults, including the San Diego incident. She denied ever having had hallucinations, but she admitted she had reported to doctors in 2002 that she heard a "radio-like voice that wasn't there." She had also told a doctor she was an angel and a faith healer. She remembered having had flashbacks about her sexual abuse, but she did not remember whether she had reported the flashbacks and nightmares to her physicians.

She had been treated by a psychiatrist, Dr. Chatsuthiphan, from January through October 2003, and during that time, she had had repeated fears that something bad was going to happen to her. She might have told him she had the false sensation of being touched when she was falling asleep, although she did not remember telling him so.

During the surgery, Jane Doe No. 1 received a spinal anesthetic that numbed her below the breastbone. She also received an intravenous sedative and Versed, a drug that may cause amnesia. The medication made her groggy and relaxed, so that she did not remember who had administered the spinal medication or when. When the surgery began, she was totally unconscious, but she woke three times during the surgery for about a minute or two each time.

Jane Doe No. 1 filed a civil suit against the hospital and defendant, but the suit was dismissed because she failed to appear for her deposition.

## B. *Prior Offense*

In 1995, Jane Doe No. 2 worked with defendant as a critical care transport nurse for an ambulance company in Los Angeles. On the night of June 6, 1995, Jane Doe No. 2 was on call and was napping in sleeping quarters at the ambulance station. Around midnight, defendant stood next to her bed and told her to get up. She did so, and defendant pinned her against the bed with his body. He put his hand under her sweatshirt and fondled her breasts, then grabbed her hand and tried to make her fondle his exposed penis. Defendant put his hands under her shorts and underwear and inserted his fingers into her vagina. Jane Doe No. 2 did not try to hit or scratch defendant, but she did try to push him away. She asked him to stop, but she did not cry out even though other people were at the station. Defendant stopped and told her he was turned on and "wanted [her] so bad." She told him he had to go because she was on call. He told her not to report the incident, or he would get her in trouble with their employer and the nursing board.

Two days later, defendant called Jane Doe No. 2 at her home in Long Beach and asked her to drive him to the Burbank airport. She drove to defendant's apartment in Hollywood and drove him to the airport.

### C. *Defense Evidence*

A coworker of defendant at the ambulance service had heard of Jane Doe No. 2's allegation against defendant in 1995. After the coworker heard the allegation, he saw Jane Doe No. 2 enter the station one morning. She appeared happy and said "hi" to everyone. Defendant than joined her, and she took defendant to the airport.

Dr. Visit Chatsuthiphan testified he had treated Jane Doe No. 1 in 2003. He failed to bring his records to court, and he claimed to have little memory of her. After looking at her records, he recalled she had auditory hallucinations, although she had denied having them, and she complained of being unable to control her thoughts.

Carmen Torres was working as a nurse in the recovery room when Jane Doe No. 1 was there. Torres never saw defendant behave inappropriately.

## III. DISCUSSION

### A. *Admission of Prior Conviction*

Defendant contends the trial court erred in admitting evidence under Evidence Code section 1108 of defendant's prior sexual offenses. He contends Evidence Code section 1108 is unconstitutional on its face and as applied and that the trial court abused its discretion in admitting the challenged evidence.

#### 1. *Background*

Defendant moved before trial to exclude evidence of his 1995 conviction for battery of a nurse (§ 243, subd. (c)) on the grounds the conviction was remote in time, the evidence would confuse the jury, and the evidence was more prejudicial than probative. Defense counsel pointed out that his conviction had been reduced to a misdemeanor after successful completion of probation. The trial court ruled that if defendant testified, the prior conviction could be used for impeachment.

The trial court later held a hearing as to whether the conduct underlying the 1995 charges would be admissible under Evidence Code section 1108. The trial court found the evidence was not unduly remote and its probative value outweighed prejudice. Jane Doe No. 2 thereafter testified at defendant's trial as set forth above.

## 2. Analysis

### a. Constitutionality of Evidence Code section 1108 on its face

■ Defendant first contends Evidence Code section 1108 is unconstitutional on its face, in that the admission of prior act evidence to show propensity violates due process. Defendant points out that before the enactment of Evidence Code section 1108, the California Supreme Court had found the admission of prior crimes evidence per se prejudicial when offered solely to prove propensity. (See *People v. Alcala* (1984) 36 Cal.3d 604, 630–631 [205 Cal.Rptr. 775, 685 P.2d 1126], superseded by statute as stated in *People v. Falsetta* (1999) 21 Cal.4th 903, 911 [89 Cal.Rptr.2d 847, 986 P.2d 182] (*Falsetta*).) Defendant acknowledges, however, that our Supreme Court has held that Evidence Code section 1108 is constitutional on its face (*Falsetta, supra*, at p. 911), and this court is bound by that ruling (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937]). In fact, this court has previously adopted the reasoning of *Falsetta*. (*People v. Hoover* (2000) 77 Cal.App.4th 1020, 1027 [92 Cal.Rptr.2d 208].) Defendant raises his challenge to preserve it for further review. We summarily reject his argument.

### b. Constitutionality of Evidence Code section 1108 as applied

Defendant next argues Evidence Code section 1108 was unconstitutional as applied because the manner in which the section operated denied him due process under the Fifth and Fourteenth Amendments to the United States Constitution. In a closely related argument, he contends the trial court abused its discretion in admitting the challenged evidence.

■ Courts presume a statute is constitutional. (*People v. Hansel* (1992) 1 Cal.4th 1211, 1219 [4 Cal.Rptr.2d 888, 824 P.2d 694].) " '[I]t is our duty to uphold a statute unless its unconstitutionality clearly, positively, and unmistakably appears; all presumptions and intendments favor its validity. [Citations.]' [Citation.]" (*Ibid.*) To show a violation of due process, a defendant must show that the statute, as applied, offended a principle of justice so rooted in the traditions and consciousness of the country that it is considered fundamental. (See *Montana v. Egelhoff* (1996) 518 U.S. 37, 43–44 [135 L.Ed.2d 361, 116 S.Ct. 2013].) The United States Supreme Court has left open the question whether admission of propensity evidence would inherently make a criminal trial so unfair as to violate due process. (*Estelle v. McGuire* (1991) 502 U.S. 62, 70, 75 & fn. 5 [116 L.Ed.2d 385, 112 S.Ct. 475]; *Falsetta, supra*, 21 Cal.4th at p. 913.) In *Falsetta*, the California

Supreme Court held it was not clear whether the rule precluding propensity evidence in sex offense cases should be deemed a fundamental historical principle of justice. (*Falsetta*, at p. 914.) The court held that because of the protections written into Evidence Code section 1108, there was no undue unfairness in the statute's limited exception to the historical rule against the use of propensity evidence. (*Falsetta, supra*, at p. 915.)

■ As the *Falsetta* court explained, the Legislature's rationale in enacting Evidence Code section 1108 was that sexual offenses are committed in secret with no corroborating evidence. (*Falsetta, supra*, 21 Cal.4th at p. 915.) Defendant argues that because the present offense took place in a busy operating room with members of the surgical team coming in and out, the primary rationale for allowing propensity evidence does not apply in his case. However, as the *Falsetta* court stated, the Legislature's rationale was not only that sex crimes are often committed in secret but also that such crimes frequently "result in trials that are largely credibility contests." (*Id.* at p. 918.) That is exactly the situation presented in the present case, in which Jane Doe No. 1's credibility was a central issue. We therefore conclude Evidence Code section 1108 was not unconstitutional as applied, and the trial court did not abuse its discretion in admitting evidence under Evidence Code section 1108.

B. *Exclusion of Expert Testimony*

Defendant contends the trial court erred in excluding expert testimony on the meaning of a *People v. West* plea.

1. *Background*

In 1995, defendant was charged with two counts of violating section 289, subdivision (a) and one count of violating section 243.4, subdivision (a) based on his conduct with Jane Doe No. 2. Under *People v. West, supra*, 3 Cal.3d 595, defendant entered a plea of nolo contendere to the lesser offense of violating section 243, subdivision (c) (battery of a nurse).

At the trial of his current offense, defendant offered the testimony of an experienced attorney, Samuel Knudsen, to explain a *People v. West* plea to the jury. The proffered testimony included an explanation of the limitations on plea bargaining in a section 289 case; the potential sentence defendant faced for the 1995 charged crimes; the collateral consequences, including registration under section 290, of a conviction under section 289; the fact that a violation of section 289 is a strike; the fact that a violation of section 243, subdivision (c) is neither a strike nor an offense requiring registration, but is a wobbler offense; and the fact that the transcript of the sentencing hearing indicated the court had expressed an intent to reduce the section 243,

subdivision (c) offense to a misdemeanor. Knudsen was also prepared to testify that a *People v. West* plea does not admit the underlying facts, but is entered because it is in the best interest of the accused. Knudsen offered his opinion, based on his experience, that knowledge of the concepts underlying a *People v. West* plea was outside the common experience of the public.

The prosecutor argued that the admission of Knudsen's testimony "invite[d] rebuttal evidence on the prosecutor's state of mind in taking the plea," defendant's state of mind, and the facts underlying the plea bargain and would lead to undue consumption of time. The trial court excluded the evidence, finding it irrelevant, because what was relevant under Evidence Code section 1108 were the underlying facts; under that section, the prior sexual conduct need not have led to a conviction or even an arrest. The trial court also found the proffered evidence would be more prejudicial than probative under Evidence Code section 352, in that it would confuse the jury because it would go to the thought processes of the prosecutor and defense counsel.

### 2. *Standard of Review*

The trial court has broad discretion in determining whether to admit or exclude expert testimony, and we do not interfere with the trial court's exercise of that discretion unless it was clearly abused. (*People v. Cornwell* (2005) 37 Cal.4th 50, 81 [33 Cal.Rptr.3d 1, 117 P.3d 622].)

### 3. *Analysis*

Evidence Code section 801 governs the use of expert testimony in trials. Under that section, a person with "special knowledge, skill, experience, training, and education" may testify as an expert witness and give testimony in the form of an opinion. (Evid. Code, § 801, subd. (b); see *People v. Gardeley* (1996) 14 Cal.4th 605, 617 [59 Cal.Rptr.2d 356, 927 P.2d 713].) Defendant argues Knudsen's testimony met that standard because a guilty plea under *People v. West* lies beyond a lay juror's knowledge. However, the trial court did not exclude the evidence because it failed to meet the standard of Evidence Code section 801. Rather, the trial court found the evidence was irrelevant and would confuse the jury. Thus, defendant's argument based on *People v. Gardeley* is unavailing.

Defendant further argues the evidence could have been limited to what was relevant and that the trial court's reasoning that the testimony would go to the thought processes of the prosecutor and defense counsel was unsupported by the proffer. However, if defendant's proffered evidence had been admitted, the prosecutor would surely have been entitled to introduce rebuttal evidence

to put that evidence in context, including evidence as to the thought processes of the participants in the underlying case. We therefore cannot say the trial court's ruling was arbitrary, capricious, or patently absurd such that the trial court abused its discretion in excluding the evidence. (See *People v. Brown* (2003) 31 Cal.4th 518, 534 [3 Cal.Rptr.3d 145, 73 P.3d 1137].)

## C. *Limiting Instruction on Fresh Complaint*

Defendant contends the trial court erred in failing to give a limiting instruction as to evidence admitted under the fresh complaint doctrine, specifically, Jane Doe No. 1's statements to Orpilla, Laoyan, and Ellis.

■ Under the fresh complaint doctrine, "proof of an extrajudicial complaint, made by the victim of a sexual offense, disclosing the alleged assault, may be admissible for a limited, nonhearsay purpose—namely, to establish the fact of, and the circumstances surrounding, the victim's disclosure of the assault to others—whenever the fact that the disclosure was made and the circumstances under which it was made are relevant to the trier of fact's determination as to whether the offense occurred." (*People v. Brown* (1994) 8 Cal.4th 746, 749–750 [35 Cal.Rptr.2d 407, 883 P.2d 949].) The jury may consider the evidence "for the purpose of corroborating the victim's testimony, but not to prove the occurrence of the crime. [Citation.]" (*People v. Ramirez* (2006) 143 Cal.App.4th 1512, 1522 [50 Cal.Rptr.3d 110].)

On request, the trial court must instruct the jury as to the limited purpose for which the fresh complaint evidence was admitted. (*People v. Brown, supra,* 8 Cal.4th at p. 757.) However, the trial court has no duty to give such an instruction in the absence of a request. (*People v. Moore* (1988) 201 Cal.App.3d 877, 886 [247 Cal.Rptr. 353].) Defendant did not request such an instruction at trial, and accordingly, the trial court had no duty to give a limiting instruction. (*Ibid.*)[3]

Moreover, even if the trial court erred in failing to give a limiting instruction, any such error was harmless; it is not reasonably probable a different result would have been reached had such an instruction been given. (See *People v. Ramirez, supra,* 143 Cal.App.4th at p. 1526 [harmless error to admit fresh complaint evidence for all purposes].) Jane Doe No. 1 testified at

[3] In fact, the trial court did instruct the jury, at least as to Laoyan's testimony. When Laoyan testified she had heard Jane Doe No. 1 had made a complaint, defense counsel objected on the ground of hearsay. The trial court overruled the objection, but instructed the jury, "I'm going to tell you it's not for the truth of the matter, the fact that there was a complaint. I would allow that answer to come in. But you can understand based upon this witness hearing something, she did something as a result of hearing the complaint, not in fact that there was a complaint or the truthfulness of the complaint."

trial, and the jury did not have to rely on her secondhand statements to other people, but was able to hear her directly and judge her credibility. Her fresh complaint statements were consistent with and cumulative to her trial testimony. (See *ibid.*) Thus, we conclude any instructional error was harmless.

## IV. DISPOSITION

The judgment is affirmed.

Richli, J., and Miller, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 22, 2008, S166641. Werdegar, J., did not participate therein.