Filed 5/31/24  P. v. Zamora CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B329521 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA155326) |
| v. | |
| VICTOR HUGO ZAMORA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Connie R. Quinones, Judge.  Affirmed with directions.

Elizabeth Richardson-Royer, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Nicholas J. Webster and Michael C. Keller, Deputy Attorneys General, for Plaintiff and Respondent.

————————

Victor Hugo Zamora appeals from a judgment of conviction after the jury found him guilty of multiple sexual and violent offenses against his former girlfriend Cindy M., including forcible rape, inflicting corporal injury on a person in a dating relationship, assault with a semiautomatic firearm, making a criminal threat, and attempting to dissuade a witness. The jury also convicted Zamora of attempted murder of a peace officer, assault with a semiautomatic firearm on a peace officer, and attempted carjacking in connection with Zamora's attempt to evade police. On appeal, Zamora contends the trial court abused its discretion in admitting evidence Zamora was a gang member and erred in allowing Cindy's statements to law enforcement and a sexual assault response team (SART) nurse into evidence under the fresh complaint doctrine.

We affirm the judgment. However, we direct the trial court to correct a clerical error in the abstract of judgment to reflect that the trial court imposed a 10-year firearm enhancement on count 9 for forcible rape, rather than on count 7 for possession of a firearm by a felon.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Evidence at Trial*

   1. *The August 18, 2021 rape of Cindy M.*

      (a) *Cindy's testimony*

Cindy testified she was in a "boyfriend and girlfriend" relationship with Zamora for a few months in 2021. Zamora frequently bought her gifts and gave her money, but she was not a "prostitute" and he did not pay her for sex. Towards the end of their relationship Zamora frequently accused Cindy of having sex

2

with his "homies." After they broke up, he sent her angry text messages such as, "'So you want to be enemies? You want everyone to laugh at me?'" and "I [would] rather be friends, but fuck you and whoever you kick it with too. This is Tone from CVTF.'" Cindy knew Zamora was a member of the Compton Varrio Tortilla Flats gang with the nickname "Tone." Zamora sent Cindy text messages referring to her stupidity and saying, "Let me whoop your ass so I can teach you.'" Cindy blocked Zamora's phone number, but he continued to contact her using other numbers.

On August 18, 2021 Zamora contacted Cindy using a messaging application and invited her to come to the motel where he was living. She agreed to go because Zamora was being nice and he promised to give her money he owed her. Zamora picked Cindy up at her family home around 6:00 or 7:00 p.m. and drove her to his motel in Compton.

Once inside the motel room, "the whole world just flipped," and Zamora started "getting crazy." He accused Cindy of sleeping with his friend and said, "'You think I'm fucking stupid?'" He pushed her head against a wall and tried to force her to ingest or snort a white powder he placed on his fingers that she believed was crystal methamphetamine. After she spat it out, he hit her on her face with his hand and cautioned her, "'Don't fucking spit,'" or he would feed her more drugs. He called her a "'bitch'" and "whore" and said he would put her in a dog cage. After an extended period of trying to force Cindy to take drugs and pacing back and forth in the room, Zamora hit Cindy in the face, causing her lip to bleed. This further agitated Zamora who said he now would have to kill her because he did not know what else to do with her.

About two hours into the ordeal, Zamora removed a semiautomatic handgun[1] from under the mattress, put it inside Cindy's mouth, and told her to take off her pants. Cindy complied, convinced he would otherwise kill her. Zamora then pushed her onto the bed and put his penis in her vagina while holding the gun in his hand. Cindy was crying, and after a time Zamora stopped, got up, and paced back and forth in the room, saying words to the effect of "what the fuck am I doing?" and that he would have to kill her. Then he returned to the bed and resumed sexual penetration. This cycle continued two or three times, while Cindy continued to cry and fear for her life.

Cindy pleaded with Zamora to let her go, begging him at least to let her leave so she could see her young children again. She promised to return to him after she took the children to school. Zamora eventually said he would let her go if she promised not to tell his friends or the police; otherwise, he would kill her. At about 6:00 or 7:00 a.m. on August 19, Zamora allowed Cindy to leave the motel. He pointed his gun at her as she walked out to his vehicle, and he drove her home, repeating that she should not tell anybody.

Once Cindy got home, she "had to pull [herself] together," and she took her children to school. Without showering, Cindy went to the Los Angeles Police Department (LAPD) station in south Los Angeles to report the assault. The LAPD officers told her they could not help her because the incident occurred in the City of Compton, and they gave her the address for the Compton sheriff's station. Cindy went to the Compton station where she

---

[1] Cindy testified the gun Zamora used to assault her looked similar to the 9-millimeter semiautomatic handgun that police later recovered.

4

reported the assault to Los Angeles Sheriff's Department (LASD) deputies.

### (b)    *Cindy's police station interview*

A videotape recording of a portion of Cindy's August 19 interview with three sheriff's deputies was played for the jury, and the jury was given a transcript of the audio. During the interview, Cindy described how Zamora pulled a gun out from under the mattress, cocked it back, put it in her mouth, and told her, "take off your fucking pants." She explained that she repeatedly threw herself on the floor to protect herself, but fearing for her life, she took off her underwear and got onto the bed and lay on her back while Zamora sexually penetrated her. Cindy was crying and Zamora stopped "because at that point he realized it was rape," and then he vacillated between pacing around while saying words to the effect of, "I don't know what I'm doing tonight," and continuing to rape her because he had already gone too far. Cindy did not know if his strange behavior was also a result of his being on drugs. One of the officers asked Cindy about a lip injury she had showed the officer before the interview; Cindy said Zamora "backhanded" her, making her lip bleed. She also said she had dried blood on her ear, which she believed was caused by an earring that popped out when Zamora grabbed her head and pulled her hair. She also reported injuries to the outside of her legs.

### (c)    *Examination by the SART nurse*

Sheriff's deputies brought Cindy to a hospital in Torrance where she was examined by SART nurse Elizabeth Castillo at around 1:00 p.m. on August 19. Castillo collected Cindy's clothes and took photographs and swab samples from Cindy's body.

Photographs admitted into evidence showed injuries to Cindy's lower and upper lips and bruising above her left knee, which Cindy testified was the result of her repeatedly throwing herself on the floor when Zamora was on top of her. Zamora's DNA was found on samples taken from Cindy's face, earlobe, neck, breast, and vulva.

Castillo testified that Cindy was crying and trembling when the sheriff's deputies brought her into the hospital, but she was coherent and there was no indication she was under the influence of alcohol or drugs. Castillo observed abrasions on Cindy's lips, right wrist, left forearm, left earlobe, neck, the front and side of her left thigh and her knee, as well as a bruise on her leg. Castillo recalled that Cindy stated her boyfriend had said he "was going to kill her, he was going to put her in a dog cage if she told anybody that he would kill her" and "he had no choice but to finish what he started." Cindy told Castillo that Zamora put a gun to her head and in her mouth and he "backhanded" her on the face. Cindy also told Castillo that Zamora had been "'doing drugs like crystal meth,'" and he kept putting the drugs on her mouth and up her nose. During cross-examination, Castillo testified she did not see anything that appeared to be crystal methamphetamine on Cindy's nose or mouth. Castillo admitted that other than Cindy's statements to her, Castillo could not tell from her physical examination whether Cindy had consensual sexual intercourse with Zamora.

2. *The August 19, 2021 police chase, shooting, and attempted carjacking[2]*

LASD Sergeants Valerie Franco and David Fujiki, and Deputy Juan Tobias went to Zamora's motel at around 4:30 p.m. on August 19, 2021 to follow up on Cindy's report. Deputy Tobias went to the motel registration window to inquire about Zamora while Sergeants Franco and Fujiki parked in an alley behind the motel. As Deputy Tobias was waiting for the manager to come out, he saw a man matching Zamora's description[3] walking through the motel parking lot. Zamora saw Deputy Tobias, stopped, faced Deputy Tobias, and reached for his waistband. As Deputy Tobias moved behind a parked vehicle for cover, he pulled out his gun and instructed Zamora: "'Let me see your hands.'" Zamora pulled out his own gun and shot at Deputy Tobias, who then returned fire. Zamora shot at Tobias again, and Tobias fired back.

Zamora ran toward the alley where Sergeants Franco and Fujiki were waiting. Zamora pointed his gun at Sergeant Franco and tried to shoot her, but the gun appeared to jam. After Sergeant Franco returned fire, Zamora threw his gun in her direction and fled down the alley. Multiple police officers pursued Zamora on foot. Zamora was apprehended after he jumped on the hood of a car driving by, the car slammed on its

---

[2] Because Zamora does not challenge his convictions of attempted murder, assault on a peace officer, and attempted carjacking, we only briefly summarize this portion of the evidence at trial.

[3] Cindy had shown the LASD deputies a photograph of Zamora when she reported the assault. Deputy Tobias, among others, identified Zamora in the courtroom during trial.

brakes, and Zamora flew off.  Zamora was arrested and taken to the hospital.

LASD investigators recovered Zamora's gun from an alley behind the motel.  The gun was an unregistered 9-millimeter semiautomatic ghost gun without a serial number.  The gun appeared to have malfunctioned with a shell casing stuck in the barrel, preventing another bullet from being fed into the chamber.  Zamora's DNA, along with the DNA of three others, was found on the magazine.

3.	*Zamora's jailhouse call to Cindy*

Zamora called Cindy from jail sometime after his arrest.  A recording of the 30-minute call was played for the jury.  At the beginning of their conversation, Zamora said to Cindy, "I was just checking up on you, making sure you're good."  Cindy responded, "[D]on't even try to call me and sit here and try to act like everything's cool," and "What the fuck? You had a gun in my mouth, nigga.  How the fuck do you expect me to feel?"  Zamora responded, "I don't want to talk about none of that right now on this."  Zamora then said, "You know I care about you, nigga . . . [¶] . . . Like you mean the world to me," to which Cindy responded, "If you cared about me, you wouldn't have done what you did."

Zamora told Cindy he needed her help to move some money around and wanted the number of "Gismo"; Cindy refused to help, saying, "Hell, no.  You brought the nigga around who's trying to kill me and shit."  Zamora told Cindy she was crazy and "that wasn't me."  Zamora continued to press her for help to contact other associates, move money around, and "to do some things out there."  Cindy again refused, saying "What the fuck?

You tried to kill me." Zamora said, "I was not trying to kill you, man" and "I just slapped you around a couple times. That's it. I'll apologize for slapping you around if you want to hear."

Zamora suggested Cindy's jealousy was "the biggest issue we had between us." Cindy disagreed and said the biggest issue was that Zamora "lost it" because he got in a fight with his friend after his ex-wife "started fucking with [his] head laughing at [him]" and he became "hella tweaked out" on drugs. Zamora responded, "We both fucked up. We both fucked [up] by having jealousy issues . . . [¶] . . . But mostly it was you."

Towards the end of the call, Zamora again asked Cindy, "I need help to maneuver things around." Cindy responded, "I'm the last person that'll help you. . . . [You] fucked up, my nigga, . . . and I can't even get an apology." Zamora responded, "I already told you I apologize for beating you up. . . . For slapping your ass around so much," and he asked whether, if he came home from jail, she was "still gonna be my girl." Cindy said no, saying she could not forgive him.

### 4. *Zamora's ex-wife's testimony*

Zamora's ex-wife, Magali Tinoco, testified that Zamora was physically abusive for several years during their marriage, and he had been convicted of domestic violence. She recounted that in February 2015, after Zamora hit Tinoco during an argument, she moved with their five children into her parents' house. Zamora came to the parents' house, cursed at Tinoco, slapped her, and was arrested. While in jail, and continuing after he was released on bail, Zamora repeatedly called Tinoco to ask her to help him, and on multiple occasions when she refused to talk to him, he sent her a text message with a picture of a gun. On one

<9>9</9>

occasion when Zamora was upset at Tinoco, he told her he was a member of the "Compton T. Flats" gang. Later in 2015 Zamora slapped Tinoco and pulled her hair in an alley behind her parents' house in the presence of their four-year-old daughter.

Zamora called Tinoco again in 2021 to ask for help while he was in jail on the charges filed in this case, but she refused.[4]

B.    *The Verdicts and Sentencing*

The jury found Zamora guilty of attempted murder of a peace officer (Deputy Tobias) (count 1; Pen. Code, §§ 187, subd. (a), 664);[5] assault with a semiautomatic firearm upon a peace officer (Deputy Tobias) (count 4; § 245, subd.(d)(2)); and attempted carjacking (count 8; §§ 215, subd. (a), 664).[6] With respect to Cindy, the jury found Zamora guilty of forcible rape (count 9; § 261, subd. (a)(2)); inflicting corporal injury on a person in a dating relationship (count 10; § 273.5, subd. (a)); assault with a semi-automatic firearm (count 11; § 245, subd. (b)); making a criminal threat (count 12; § 422, subd. (a)); and dissuading a witness by force or threat (count 13; § 136.1, subd. (c)(1)). Before trial, Zamora pleaded no contest to possession of a firearm by a felon (count 7; § 29800). As to counts 1, 4, 9, and 11 the jury found true Zamora personally used a firearm in the commission of the offenses (§ 12022.5, subd. (a)). As to count 1, the jury also

---

[4]    Zamora did not call any witnesses or present evidence at trial.

[5]    All further undesignated statutory references are to the Penal Code.

[6]    The jury found Zamora not guilty of the attempted assaults with a firearm of Sergeants Fujiki and Franco, as charged in counts 5 and 6.

10

found true the attempted murder of Deputy Tobias was committed against a peace officer in the performance of his duties (§ 664, subd. (e)).

In a bifurcated proceeding, the trial court found true Zamora suffered a prior strike conviction in 2016 for making a criminal threat (§ 422). The court also found true four circumstances in aggravation under California Rules of Court, rule 4.421(a)(1), (a)(2), (b)(2), and (b)(3).

The trial court sentenced Zamora to an aggregate term of 55 years to life. On count 1 for the attempted murder of Deputy Tobias, the court imposed an indeterminate term of 24 years to life, comprising the base term of seven years to life, doubled under the three strikes law (§§ 667, subds. (b)-(i), 1170.12, subd. (c)(1)), plus 10 years for the firearm enhancement. The court imposed a 26-year base term on count 9 for the rape of Cindy M., comprising the upper term of eight years doubled under the three strikes law, plus 10 years for the firearm enhancement.[7] The court imposed consecutive terms of two years on count 13 for dissuading a witness (one-third the middle term doubled); one year eight months on count 8 for attempted

---

[7] The abstract of judgment incorrectly states that the court imposed a 10-year enhancement for personal use of a firearm (§ 12022.5, subd. (a)) on count 7 instead of count 9. The trial court should correct the clerical error. (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185 ["Courts may correct clerical errors at any time, and appellate courts . . . have ordered correction of abstracts of judgment that did not accurately reflect the oral judgments of sentencing courts"]; *People v. Gobert* (2023) 89 Cal.App.5th 676, 689 [same].)

11

carjacking (one-third the middle term of five years);[8] and one year four months on count 7 for possession of a firearm by a felon (one-third the middle term of two years doubled). The court stayed the sentences on the remaining counts pursuant to section 654.

Zamora timely appealed.

## DISCUSSION

A. *The Trial Court Did Not Abuse Its Discretion in Admitting Evidence of Zamora's Gang Membership*

1. *Relevant proceedings*

The People in their trial brief requested an in limine determination of "[t]he relevancy of any testimony and evidence regarding the gang membership of [Zamora] and Cindy M. under an Evidence Code section 352 analysis." The trial court ruled on the motion at the pretrial hearing: "Based on what the court's heard thus far about telephone calls, jail calls how he identifies himself as Tone from a particular gang, the court's going to admit this over defense objection. So that would be coming in, even though there's not a gang allegation and there's not any further punishment what have you for gang. But it will come in and jurors will hear about your gang affiliation, as well as the victim[']s."

In his opening argument, the prosecutor read Zamora's text message to Cindy stating, "'[F]uck you and whoever you kick it with too. This is Tone from CVTF,'" and explained that Tone was

---

[8] The sentence on the attempted carjacking count was for one-half the term of imprisonment under section 664, subdivision (a), but it was then doubled under the three strikes law.

12

Zamora's gang moniker and he was a member of the Compton Varrio Tortilla Flats gang.  The prosecutor argued Cindy was affiliated with gangs and knew other gang members, and Zamora's messages after their breakup reflected that "he was constantly jealous and worried about being laughed at by his homies, by his fellow gang members [and] that Cindy was dating or hanging out with his fellow gang members."

Cindy testified she was not a member of the Compton Varrio Tortilla Flats gang and she did not know any of its members besides Zamora.  But she testified she knew Zamora was a member of the gang during their relationship.  Tinoco likewise testified that Zamora told her he was a member of the gang.  There were no other direct references to Zamora's gang membership during the trial or in the closing arguments.  However, the topic of Zamora's "homies" and associates arose in multiple contexts:  Cindy testified Zamora was fixated on the idea she had been having sex with his homies; Zamora threatened to kill her if she told his homies about the August 18 rape; and during the jailhouse call Cindy told Zamora she believed he "brought the nigga around who's trying to kill me and shit," in an apparent reference to one an associate of Zamora with the nickname "Gismo."

2. *Governing law*

Zamora contends the trial court erred in admitting evidence of his gang membership because the evidence was substantially more prejudicial than probative under Evidence Code section 352.  Evidence Code section 352 provides, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission

13

will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Accord, *People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 771; *People v. Chhoun* (2021) 11 Cal.5th 1, 26 (*Chhoun*).) "'[T]he prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. "[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is 'prejudicial.' The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues."'" (*People v. Jones* (2017) 3 Cal.5th 583, 610; accord, *People v. Bell* (2019) 7 Cal.5th 70, 105 ["'"Evidence is not prejudicial, as that term is used in [an Evidence Code] section 352 context, merely because it undermines the opponent's position or shores up that of the proponent."'"].)

"The People are generally entitled to introduce evidence of a defendant's gang affiliation and activity if it is relevant to the charged offense." (*Chhoun, supra*, 11 Cal.5th at p. 31; accord, *People v. McKinnon* (2011) 52 Cal.4th 610, 655 (*McKinnon*).) "'Evidence of the defendant's gang affiliation . . . can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime.'" (*Chhoun*, at p. 31; accord, *People v. Becerrada* (2017) 2 Cal.5th 1009, 1022; *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 (*Hernandez*).) "Even when it is relevant, however, 'courts should carefully scrutinize evidence of a defendant's gang membership because such evidence "creates a

14

risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty of the offense charged.'"'" (*Chhoun*, at p. 31; accord, *People v. Melendez* (2016) 2 Cal.5th 1, 28-29; see *Hernandez*, at p. 1049 ["In cases *not* involving the gang enhancement, we have held that evidence of gang membership is potentially prejudicial and should not be admitted if its probative value is minimal."].)

"On appeal, we review for abuse of discretion a trial court's ruling on whether the evidence is relevant, not unduly prejudicial, and thus admissible." (*McKinnon, supra*, 52 Cal.4th at p. 655.) "'[T]he trial court is vested with wide discretion in determining relevance and in weighing the prejudicial effect of proffered evidence against its probative value. Its rulings will not be overturned on appeal absent an abuse of that discretion.'" (*People v. Hardy* (2018) 5 Cal.5th 56, 87; accord, *People v. Williams* (2008) 43 Cal.4th 584, 634-635 ["a trial court's discretionary ruling under [Evid. Code, § 352] '"must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice"'"].)

3. *The trial court did not abuse its discretion in finding any prejudicial effect of Zamora's gang membership did not substantially outweigh its probative value*

Zamora contends the probative value of the evidence he was a member of the Compton Varrio Tortilla Flats gang was "minimal at best" and limited to whether Zamora committed the offenses of making a criminal threat and dissuading a witness. Further, he argues, Cindy's testimony that Zamora threatened to kill her and she feared for her life was based on his words and

15

behavior, not his gang affiliation. Zamora's gang membership was probative of multiple issues, and the trial court did not abuse its discretion in admitting it.

The trial court allowed evidence of Zamora's gang membership based on the fact Zamora identified himself as "Tone from CVTF" in a text message threatening Cindy around the time of their breakup. Zamora's identification as a gang member was therefore central to the nature of this threat and its effect on Cindy. In addition, Zamora referred to his homies and used nicknames for other associates in his messages and calls with Cindy. And, as defense counsel acknowledged in his questioning of Cindy, during the jailhouse call Zamora asked her to try "to get ahold of different people, to Chuco and Smalls and et cetera," to help Zamora from outside the jail.

Moreover, the central theory of the prosecution case was that Zamora was fixated on his belief Cindy was cheating on him with his gang associates and they were laughing at him behind his back, enraging Zamora and motivating him to hurt and humiliate Cindy. This theory was supported by Zamora's accusatory messages around the time of their breakup, his threat during the rape that he would kill her if she told the police *or his homies*, and the jailhouse call in which he continued to focus on whether she was having a sexual relationship with "Gismo" and other associates. Cindy's (and Tinoco's) brief testimony that Zamora identified himself as a member of Compton Varrio Tortilla Flats gang with the moniker "Tone" was essential context for this evidence, which in turn was critical to establishing Cindy's credibility, Zamora's motive, and the circumstances in which he committed the rape and other offenses against her. (See *Chhoun, supra*, 11 Cal.5th 1 at pp. 31-32 [court did not

16

abuse its discretion admitting evidence of defendant's gang affiliation and other gang evidence in robbery-murder case to explain defendants' relationship with accomplices, his identity as one of the perpetrators, his role during the orchestrated robbery, and his motive]; *McKinnon, supra*, 52 Cal.4th at p. 655 [trial court did not abuse its discretion in admitting gang evidence to show defendant's motive for shooting victim was to retaliate for murder committed by rival gang]; *People v. Brown* (2003) 31 Cal.4th 518, 547 [trial court did not abuse its discretion in admitting evidence that defendant took an oath on his gang when he shot the victim, which showed his statement that he shot the victim was truthful and not "mere bravado"].)

Evidence of Zamora's gang affiliation was also relevant to prove Zamora was guilty of making a criminal threat. To prove the offense, the prosecution had to establish, among other elements, that Zamora's threats caused Cindy to be in actual and reasonable sustained fear for her own safety and the safety of her family. (§ 422, subd. (a); *In re George T.* (2004) 33 Cal.4th 620, 630.)[9] The fact that Zamora was a gang member—and explicitly

---

[9] The jury was instructed with CALCRIM No. 1300, as follows: "To prove that the defendant is guilty of [criminal threat under section 422], the People must prove that: 1. The defendant willfully threatened to unlawfully kill or unlawfully cause great bodily injury to Cindy M.; [¶] 2. The defendant made the threat; [¶] 3. The defendant intended that statement be understood as a threat; [¶] 4. Under the circumstances, the threat was so clear, immediate, unconditional, and specific that it communicated to Cindy M. a serious intention and the immediate prospect that the threat would be carried out; [¶] 5. The threat actually caused Cindy M. to be in sustained fear for her own

17

identified himself as a gang member in a message threatening her—was relevant to explain Cindy's sustained fear for her own safety. (See *People v. Hernandez, supra*, 33 Cal.4th at p. 1053 ["[g]ang testimony was relevant . . . to explain how [defendant's] statement could induce fear in the victim"].)

Zamora argues the gang evidence was cumulative because if the jury believed Cindy's testimony, there was much stronger evidence that she was placed in sustained and reasonable fear based on Zamora's repeated threats to kill her over several hours, his holding a gun to her head or in her mouth, and his erratic behavior. While this is compelling evidence, the proof relies entirely on the jury believing Cindy's testimony at trial and that she truthfully reported the rape to the police and SART nurse. Evidence of Cindy's fear beyond her own testimony was more limited, based principally on her actions, demeanor, and injuries on the morning of August 19. Although it is true Cindy testified she knew Zamora was a gang member while they were dating and she was not bothered by it, in the jailhouse call Cindy did not respond to Zamora's inquiry as to where she was at the time,[10] and she stated her belief he sent an associate "who's trying to kill me and shit."

Thus, although the evidence Zamora was a gang member may have been prejudicial, it helped to bolster the People's case

---

safety; and [¶] 6. Cindy M.'s fear was reasonable under the circumstances."

[10] During the jail call Zamora asked, "Where are you at now? Where you at? Home or what?" Cindy responded, "Right now I'm in—don't worry about where the fuck I'm at. What the fuck?"

that otherwise depended heavily on Cindy's testimony. Its probative value was therefore far from "'minimal,'" and the trial court did not abuse its discretion in admitting it. (*People v. Becerrada, supra*, 2 Cal.5th at p. 1022; *People v. Hernandez, supra*, 33 Cal.4th at p. 1049.)

B.      *The Trial Court Erred in Admitting All of Cindy's Police Interview and Her Statements to the SART Nurse, but the Error Was Harmless*

        1.      *Relevant proceedings*

The People in their trial brief requested permission to introduce "[t]estimony and evidence regarding Cindy M.'s statement to deputies and the SART nurse under the 'Fresh Complaint' Doctrine[.]" At the pretrial hearing, defense counsel declined the trial court's offer to present argument, stating "[j]ust objection," and he did not request a limiting instruction. The court found, "[B]eing that it's within hours of the allegations in this matter that [Cindy] went to the L.A. County Sheriff's Department, spoke to deputies, I understand that there is body cam and her demeanor was that she was upset, possibly crying, exhibiting fear, and that she went directly to the police after she dropped her children off, did not shower, and went to a SART nurse and was then examined, the court's going to find that this is relevant, and the prejudicial value does not outweigh the probative value. [¶] And so the court's going to admit it as being relevant. And so that's going to come in as a fresh [complaint] . . . . So the court's going to admit the statements that she made to the deputies and the SART nurse."

As discussed, a video recording of an extended portion of Cindy's August 19, 2021 interview with sheriff's deputies was

played for the jury, without redaction.[11]  In addition, Castillo testified with respect to Cindy's statements during her physical examination on the afternoon of August 19, including details about Zamora's threats and the unfolding of events on August 18. Zamora's attorney did not object at trial to the scope of the prior complaints evidence.  The trial court instructed the jury with CALCRIM No. 318 that it could consider witness statements before trial "in two ways: to evaluate whether the witness'[s] testimony in court is believable; and as evidence that the information in earlier statements is true."

2.      *The fresh complaint doctrine*

Under the fresh complaint doctrine, "proof of an extrajudicial complaint, made by the victim of a sexual offense, disclosing the alleged assault, may be admissible for a limited, nonhearsay purpose—namely, to establish the fact of, and the circumstances surrounding, the victim's disclosure of the assault to others—whenever the fact that the disclosure was made and the circumstances under which it was made are relevant to the trier of fact's determination as to whether the offense occurred." (*People v. Brown* (1994) 8 Cal.4th 746, 749-750 (*Brown*); accord, *People v. Manning* (2008) 165 Cal.App.4th 870, 880 (*Manning*).)

As the Supreme Court explained in *Brown*, evidence the victim made a complaint and the circumstances surrounding her disclosure are properly admissible because the evidence "frequently will help place the incident in context, and may assist the jury in arriving at a more reliable determination as to

---

[11]     The record does not reflect that the video was redacted although, as noted, only a portion of the interview was played.

whether the offense occurred." (*Brown, supra*, 8 Cal.4th at p. 760; *accord, People v. Ramirez* (2006) 143 Cal.App.4th 1512, 1522 (*Ramirez*) ["Evidence admitted pursuant to this doctrine may be considered by the trier of fact for the purpose of corroborating the victim's testimony, but not to prove the occurrence of the crime."]; *Manning, supra*, 165 Cal.App.4th at p. 880 [same].) Such evidence may be relevant "[f]or a variety of nonhearsay purposes"; for example, "if such a victim did, in fact, make a complaint promptly after the alleged incident, the circumstances under which the complaint was made may aid the jury in determining whether the alleged offense occurred. Furthermore, admission of evidence that such a prompt complaint was made also will eliminate the risk that the jury, if not apprised of that fact, erroneously will infer that no such prompt complaint was made." (*Brown,* at p. 761.)

"[O]nly the fact that a complaint was made, and the circumstances surrounding its making, ordinarily are admissible; admission of evidence concerning details of the statements themselves, to prove the truth of the matter asserted, would violate the hearsay rule." (*Brown, supra*, 8 Cal.4th at p. 760; see *People v. Loy* (2011) 52 Cal.4th 46, 55, 65-67 (*Loy*) [trial court erred in admitting evidence under the fresh complaint doctrine of statements made by victim of rape and murder to a friend that the defendant had previously touched her, although the error was harmless]; *Ramirez, supra*, 143 Cal.App.4th at p. 1522, 1526 [trial court erred in admitting under the fresh complaint doctrine the victim's statements to third parties that a man she met the

21

prior night at a party raped her and dropped her off when his car got a flat tire, but the error was harmless].)[12]

3.     *The trial court erred in admitting Cindy's prior complaints, and we decline to find forfeiture*

Zamora contends the trial court erred in allowing the People to present evidence of Cindy's complaints to the police and Castillo under the fresh complaint doctrine because the statements went far beyond the fact she made the complaints and the circumstances surrounding them.  Further, the court instructed the jurors they could consider Cindy's prior statements for their truth and failed to give a limiting instruction.

We agree the trial court erred in allowing the jury to view an unredacted and extended video of Cindy's interview with the LASD sheriffs and in allowing Castillo to recount all of Cindy's statements during her SART examination.  The court described the law correctly when it reasoned that Cindy's demeanor in the prior complaints, including the fact she was upset, crying, and fearful, and the circumstances of her complaint, such as the fact she went directly to the police on the morning of August 19 without showering, constituted admissible, relevant evidence under the fresh complaint doctrine to prove the rape and assault had occurred.  (*Brown, supra*, 8 Cal.4th at p. 760 ["evidence of the circumstances surrounding a victim's reporting or disclosure of

---

[12]     In *Loy, supra*, 52 Cal.4th 46 and *Ramirez, supra*, 143 Cal.App.4th 1512, the courts also rejected the People's argument the statements were admissible as spontaneous statements.  The People in this case do not argue Cindy's hearsay statements were admissible under any hearsay exception.

an alleged crime clearly falls within the bounds of 'relevant evidence'"].)

However, the evidence the trial court allowed in granting the prosecutor's in limine motion went beyond the fact and circumstances of Cindy's complaints. During the police interview played for the jury, Cindy gave a detailed account of the events that occurred in Zamora's motel room on August 18, 2021, including that Zamora produced a gun from under the mattress, told Cindy he would kill her if she did not undress, cocked the gun before holding it in her mouth, stopped several times during the rape to pace around the room "because he realized that [it] was rape," told Cindy he would kill her if she said anything to his homies or the police, and may have acted "all weird" because he was on drugs. Similarly, Castillo's testimony was not limited to Cindy's injuries, appearance, and demeanor during the examination, nor the necessary context to explain the scope of Castillo's forensic examination. Instead, the prosecutor elicited Castillo's testimony that Cindy reported Zamora was a "boyfriend" who told her he was going to "put her in a dog cage"; told her during the rape he had "no choice but to finish what he started"; and was using crystal methamphetamine. Admission of these details served no cognizable non-hearsay purpose. (*Brown, supra*, 8 Cal.4th at p. 760-761; see *Loy, supra*, 52 Cal.4th at p. 65; *Ramirez, supra*, 143 Cal.App.4th at p. 1522.)

In their respondent's brief, the People do not substantially dispute that admission of Cindy's prior complaints was error. They argue instead that Zamora forfeited the issue because his attorney did not seek to narrow or redact the prior complaints evidence, and further, he failed to request a limiting instruction. The People are correct that a defendant's bare objection to

evidence generally is inadequate to preserve the objection on appeal.  (See *People v. Partida* (2005) 37 Cal.4th 428, 433-434 ["'we have consistently held that the "defendant's failure to make a timely and specific objection" on the ground asserted on appeal makes that ground not cognizable'"]; *id.* at p. 434 ["[A] specifically grounded objection to a defined body of evidence serves to prevent error.  It allows the trial judge to consider excluding the evidence or limiting its admission to avoid possible prejudice.  It also allows the proponent of the evidence to lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal."].)  Likewise, a limiting instruction is only required if it is requested.  (See *Manning, supra*, 165 Cal.App.4th at p. 880 ["On request, the trial court must instruct the jury as to the limited purpose for which the fresh complaint evidence was admitted.  [Citation.]  However, the trial court has no duty to give such an instruction in the absence of a request."].)

However, "application of the forfeiture rule is not automatic."  (*In re S.B.* (2004) 32 Cal.4th 1287, 1293; accord, *Unzueta v. Akopyan* (2019) 42 Cal.App.5th 199, 215.)  The People's trial brief properly relied on *Brown, supra*, 8 Cal.4th at page 760 with respect to application of the fresh complaint doctrine (limiting the scope of the admissible evidence), and it may not have been clear to Zamora's attorney until the trial court made its ruling that the court would fail to distinguish between the admissible testimony (of the fact of the complaint and circumstances) and the inadmissible details of the complaint.  Moreover, in light of the extensive details in Cindy's prior complaints presented at trial, it is unlikely a limiting instruction would have been adequate to prevent the jury from considering

24

improper hearsay.  (*Brown,* at p. 763 ["if the details of the victim's extrajudicial complaint are admitted into evidence, even with a proper limiting instruction, a jury may well find it difficult not to view these details as tending to prove the truth of the underlying charge of sexual assault [citation], thereby converting the victim's statement into a hearsay assertion"].)  We therefore decline to find forfeiture.

4.      *Admission of Cindy's statements was harmless*

Although we find the trial court erred in admitting the details of Cindy's prior complaints, we agree with the People the error was harmless.  We will not reverse a judgment for the improper admission of hearsay unless it is reasonably probable that a result more favorable to the defendant would have been reached in the absence of the error under the standard enunciated in *People v. Watson* (1956) 46 Cal.2d 818.  (*People v. Valencia* (2021) 11 Cal.5th 818, 840; *Loy, supra*, 52 Cal.4th at p. 67; *Ramirez, supra*, 143 Cal.App.4th at p. 1526.)  There is no reasonable probability Zamora would have received a more favorable result if the hearsay statements in Cindy's complaints to the police and to Castillo had been excluded.

Cindy testified at length about the assault and rape and the surrounding circumstances, including her relationship with Zamora and how she voluntarily went to the motel on August 18.  She testified that once she went inside the motel room he hit her, called her names, threatened to lock her in a dog cage, tried to force her to ingest crystal methamphetamine, produced a gun, put it in her mouth, and threatened to kill her if she did not cooperate.  Further, she described how during the rape he repeatedly stopped to pace around the room, ranting about

25

needing to kill her, and when he allowed her to leave to see her children, he pointed a gun at her on the ride home and again threatened to kill her if she said anything to his homies or the police. With the single exception of Cindy's statement to the sheriff's deputies that Zamora's gun was cocked when he put it in her mouth, the details in Cindy's prior complaints were cumulative of her much more detailed trial testimony. The jury did not have to rely on any hearsay statement in the complaints to determine if and how Zamora raped, assaulted, and criminally threatened Cindy.

Zamora argues the trial court's error was not harmless because "[g]iven Cindy's credibility issues, the corroborating, largely, consistent reports she gave the day after the events impermissibly bolstered her believability in the jury's eyes." However, the jury had the opportunity to evaluate Cindy's credibility at trial, and defense counsel cross-examined her about the inconsistencies in her story and her motive to lie about a consensual encounter.[13] The prosecution also presented ample evidence to support her account separate from Cindy's prior complaints, including Zamora's threatening text messages and the jail call in which Zamora admitted he "slapped [Cindy] around" and, when she accused him of holding a gun in her mouth and trying to kill her, he responded only with "I don't

---

[13] For example, defense counsel impeached Cindy's testimony that Zamora had promised to pay her back with money he owed her if she came to the motel on August 18 with her testimony at the preliminary hearing that Zamora had offered her a gift of money and there was no debt.

want to talk about none of that right now on this" and "I'll apologize for slapping you around if you want to hear." Zamora's text messages and statements on the jail call also established Zamora's motivating jealousy and undermined the defense theory that Cindy was a prostitute who was lying about having a dating relationship with Zamora. The jury heard Tinoco's account of domestic abuse during her marriage with Zamora, which included striking Tinoco in front of their young child and an implied threat of gun and gang violence,[14] and the jury heard about Zamora's attempts to shoot Deputy Tobias on August 19. Finally, consistent with the fresh complaint doctrine, the jury could consider the circumstances of Cindy's prior complaints, including the fact she went to two police stations without showering within hours after Zamora raped her to report the crime, and the jury properly relied on Cindy's appearance and demeanor on the police interview video, and Castillo's observations about how Cindy looked and acted, to make a "more reliable determination as to whether the offense occurred." (*Brown, supra*, 8 Cal.4th at p. 760.)

---

[14] The trial court allowed Tinoco to testify about Zamora's domestic abuse as propensity evidence under Evidence Code section 1109. Zamora does not challenge this ruling on appeal.

## DISPOSITION

The judgment is affirmed.  The trial court is directed to correct the abstract of judgment to reflect that the court imposed a 10-year sentence enhancement for personal use of a firearm (§ 12022.5, subd. (a)) on count 9 for forcible rape (§ 261, subd. (a)(2)) and not on count 7 for possession of a firearm by a felon (§ 29800), and to send a corrected abstract of judgment to the Department of Corrections and Rehabilitation.

FEUER, J.

We concur:

MARTINEZ, P. J.

RAPHAEL, J.[*]

---

[*]    Judge of the San Bernardino County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

28